Albert NEUMANN, et al., Appellants,

v.

The REINFORCED EARTH COMPANY.

No. 84–5532.

United States Court of Appeals, District of Columbia Circuit.

Argued May 24, 1985.
Decided March 25, 1986.

See also, D.C., 109 F.R.D. 698.

Wayne M. Mansulla, with whom Robert A. Taylor, Jr., Michelle A. Parfitt, James M. Hanny, Jerry D. Anker and Ann Adams Webster, Washington, D.C., were on brief, for appellants.

Richard McMillan, Jr., with whom Adrienne J. Davis, Washington, D.C., was on brief, for appellees.

Before GINSBURG and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

██ This is an appeal from a judgment notwithstanding the verdict entered by the district court in favor of the defendant, now the appellee, Reinforced Earth Company ("RECO"), 594 F.Supp. 139. Appellants, Albert Neumann, *et al.*, seek reinstatement of the jury's finding that RECO violated section 2 of the Sherman Act by attempting to monopolize a market for retaining walls. That attempt, the jury found, consisted of engaging in "sham litigation" against Neumann and his company in order to keep them out of the market. Because we find that appellants failed to define a proper relevant market at trial, as they were required to do, we affirm the ruling of the district judge.

I.

RECO was founded in 1971 to market a patented technology for building retaining walls. Retaining walls keep earth masses in place and are commonly used in the construction of highways and bridges, but have other applications as well. From 1971 to 1976, Neumann, an independent contractor, did drafting work for RECO. In 1976, Neumann terminated that relationship and formed a company to work on his own retaining wall design. After developing his Tension Retaining Earth System ("TRES"), Neumann applied for a patent. A design owner needs a patent so that contractors who wish to use the design must pay royalties.

When RECO learned of Neumann's patent plans and of a demonstration TRES wall he had built, it began a series of lengthy and complex legal proceedings against him. Neumann claims RECO knew these proceedings were without merit, hence sham litigation designed solely to keep him out of the retaining wall market. In the view we take of this appeal, it is not necessary to rehearse the intricacies of these proceedings and we merely outline them.

In February, 1977, RECO sued Neumann in federal district court in Maryland, alleg-

ing misappropriation of trade secrets, trademark infringement, unfair competition, and breach of a fiduciary relationship. While the suit was pending, Neumann's patent became due to issue. RECO moved for an injunction against issuance. By agreement of the parties, RECO dropped this motion and instituted a protest in the Patent Office.

On June 5, 1978, the Maryland court ruled that despite certain similarities, Neumann's wall and the RECO wall he allegedly copied "are based on completely different mechanical principles." Appellants' Record Excerpts at 92. The court rejected all of RECO's claims except one, holding that RECO was entitled to an injunction against future disclosure of trade secrets and confidential information contained in drawings and documents Neumann had retained and against any use by Neumann of certain confidential calculations and designs. *Id.* at 106.

The Patent Office proceedings—which had been held in abeyance pending the outcome of the Maryland suit—then went forward. In response to RECO's protest, the Patent Office withdrew Neumann's patent from issue for closer examination "because newly discovered prior art raises serious questions of patentability." Appellee's Record Excerpts at 32. There followed complicated proceedings involving a number of issues. Suffice it to say that RECO, although very persistent in filing allegations, fared badly. All of its contentions were ultimately rejected by the Patent Examiner and by an Assistant Commissioner. Neumann's patent issued in July, 1982.

Neumann filed the present action during the patent protest's pendency. On May 27, 1982, the district judge granted summary judgment for RECO. He dismissed Neumann's antitrust claims on the ground that Neumann failed to show either his experience in the retaining wall business or his ability to obtain financing, and therefore did not establish that he was actually prepared to enter the market. The court dismissed the common law abuse-of-process claims (analogous to the present "sham litigation" contentions) on the ground that Neumann was barred by res judicata and was equitably estopped from challenging the patent protest by his acquiescence in the protest's initiation. On June 21, 1983, this court reversed and remanded. *See Neumann v. Vidal,* 710 F.2d 856 (D.C.Cir. 1983).

A jury trial was conducted and on March 28, 1984, the jury concluded that there had been no actual monopolization and that the Maryland suit had not been a sham. The jury, however, found that the patent protest was a sham and that RECO had filed it in an attempt to monopolize the market for retaining walls and awarded Neumann damages of $1 million. *See* Appellants' Record Excerpts at 69–73.[1] On July 5, 1985, the trial judge entered judgment for RECO notwithstanding the verdict. *Id.* at 16. The district judge offered four reasons for granting RECO's judgment n.o.v. motion. He held Neumann had failed to prove: (1) the patent protest was a sham; (2) a "dangerous probability" that RECO's actions could win it a monopoly; (3) standing; and (4) damages. Because we find the second reason adequate to support the district court's judgment, we have no occasion to examine the others.

## II.

Section 2 of the Sherman Act, 15 U.S.C. § 2 (1982), provides, among other things, that it is unlawful to "attempt to monopolize ... any part of the trade or commerce among the several States." Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a) (1982), creates a private right of action in any person "injured in his business or property" by reason of any antitrust violation.

---

1. With respect to the common law abuse-of-process claim, the jury specifically found that neither the Maryland suit nor the patent protest constituted an abuse of process. Joint Appendix at 72. This finding was not disturbed by the trial judge and was not presented to us on appeal.

It will be useful to put the concepts of predation, sham litigation (which is a subcategory of predation), and attempted monopolization in their legal context. It is now settled, despite doubts created by some earlier decisions, that a company does not "monopolize" by growing at the expense of rivals due to its superior efficiency. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). It follows that a competitor does not commit the offense of attempting to monopolize by attempting to grow through efficiency. When the law speaks of attempts to monopolize it generally refers to predation. Predation involves the deliberate seeking of monopoly power by means other than superior efficiency, by means that would not be employed in the normal course of competition. Thus, predation involves aggression against business rivals through the use of business practices that would not be considered profit maximizing except for the expectation that (1) actual rivals will be driven from the market, or the entry of potential rivals blocked or delayed, so that the predator will gain or retain a market share sufficient to command monopoly profits, or (2) rivals will be chastened sufficiently to abandon competitive behavior the predator finds threatening to its realization of monopoly profits.

An extensive theoretical and empirical literature has grown up concerning methods of predation and the conditions under which it may occur. We need not enter into the complexities of that debate because Neumann alleged a technique—predatory litigation—about whose existence there is no theoretical or empirical doubt.[2] Special problems arise, however, when the technique of predation alleged is an approach to an arm of government, such as a court or an agency. Citizens have a first amendment right to petition government for action on their behalf and government needs the information and suggestions that parties bring it even when those parties act out of self-interest.[3] For that reason, the law requires that litigation be a "sham" before it may be held to constitute a violation of the Sherman Act. It is not enough to be found to have attempted to monopolize that the party's sole intent in bringing an action is to exclude a rival from the market. The patent laws, involved here, give the right to do just that for reasons of economic efficiency. *See* W. Bowman, *Patent and Antitrust Law* 2 (1973). It is also an element of the offense that the party demonstrate knowledge that its legal proceeding is without merit. The development of doctrine on this topic may be found in the Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30

2. Doubts have been expressed about the frequency, or even the existence, of much alleged predatory behavior because of the great costs such behavior inflicts upon the predator. Predatory price-cutting, for example, requires the would-be monopolist to expand output, and so depress the market price, sufficiently to make the intended victim lose money. The difficulty is that the predator must also sell at a loss and to a much larger part of the market, particularly if the victim cuts back production during the period of the assault. This fact makes price-cutting a relatively unappealing mode of aggression. Sham litigation, however, does not suffer from this drawback since the litigation costs of the predator need not be any larger than those of the victim, either proportionately or absolute-

ly. There is, in addition, the prospect that a court or agency order may keep the victim from operating at all until the litigation is concluded, when, since the litigation is a sham, the victim, if it survives, will presumably win.

3. Viewing the matter from a perspective congenial to antitrust policy, it may be said that the possession of legal rights contributes to a company's efficiency in the same way that possession of any other asset does, so that the legitimate assertion of a legal right against a competitor, however, damaging to the competitor, or even to competition, that may be, does not constitute monopolizing or attempting to monopolize within the meaning of the Sherman Act.

L.Ed.2d 642 (1972); and *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974), *summarily aff'g* 360 F.Supp. 451 (D.Minn. 1973).

■ Neumann claims that RECO tried to keep him from the market with sham litigation in the Patent Office and is therefore guilty of an attempt to monopolize. But even if the litigation was a sham, a point we do not decide, Neumann must still prove the other elements of an illegal attempt to monopolize. He must prove that the defendants' action created a "dangerous probability" that a monopoly would be achieved. *See Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). Before a court can find that such a probability exists, the would-be monopolist must possess "a measure of power in the relevant market." 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 831, at 336 (1978). Power in a market is determined, at least in large part, by the share of that market held. *See United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Areeda & Turner suggest that a share of 30% or less presumptively disproves requisite power. 3 P. Areeda & D. Turner, *supra,* ¶ 835c, at 350. Perhaps a higher threshold could be justified but in this case the location of the threshold does not matter.

It might be argued that there should be no need to prove the element of market power, or a dangerous probability of success, separately. If a tactic, including litigation, is really predatory (*i.e.,* in this case a sham: known to be without merit), that fact might seem to establish a dangerous probability of success. No one would incur the cost of litigation to keep a single competitor from the market if there were enough other rivals so that after successful predation the market would remain competitive. A company that undertakes sham litigation, it may be supposed, thereby demonstrates that it thinks itself close to success, and courts could reasonably take the defendant's informed belief as proof

enough. In price-fixing cases, after all, courts do not require the plaintiff to prove the defendants' market power, though price fixing by those without market power would be quite harmless, because we suppose that the conspirators know the market best and we take their beliefs as sufficient. That is one of the things that is meant when naked price-fixing is said to be illegal per se. The required showing of "dangerous probability," however, may provide a court with some assurance, otherwise lacking, that the bad faith litigation constitutes an anticompetitive act and is not merely legal harassment for personal motives. In the latter case the appropriate action would be one in tort for abuse of process or malicious prosecution, not one invoking the full panoply of the antitrust laws, including recovery of triple damages. In any case, and whatever the reason, the law does require a dangerous probability of success, and Neumann, in order to prevail, was required to show RECO's share of the relevant market. He did not succeed.

RECO argued that the relevant market encompassed all retaining walls for which RECO competes, a category that RECO claimed was comprised of "retaining walls used for purposes other than landscaping." Brief for Appellee at 41. Neumann advocated the selection of one of two possible submarkets: (1) "retaining walls in all federal and state highway projects where Reinforced Earth is specified as a sole product or alternate," or (2) "all retaining walls maximum height 20 feet or over." *Id.* at 40–41 (citing Trial Transcript at 2504–05).

Only a small space was provided on the special verdict form for the jury to identify their finding of the relevant market. In that space the jury wrote "retaining walls" without further elaboration. Appellants' Record Excerpts at 70. Elsewhere the jury affirmed that "there was a dangerous probability that [RECO] would achieve monopoly power in the relevant market." *Id.* at 71.

Because of the jury's characterization of the relevant market as consisting of "retaining walls," the district judge found suf-

ficient grounds for granting RECO's judgment n.o.v. motion. The court credited testimony by the president of RECO that the total size of the retaining wall market is around $500 million in sales, and that RECO's total sales ranged from 1.8% to 4.5% of this figure during the period of the patent protest. As a matter of law, a market share this small cannot support an attempted monopolization claim.

Although Neumann initially appeared to accept the fact " 'that the jury has chosen defendant's definition of the relevant market,' " see Brief for Appellee at 39, he now contends that the district judge has misinterpreted the verdict. Appellants argue that the jury did not find a market consisting of "all retaining walls," and that even RECO did not argue for such a broad definition of the relevant market.

Three possible markets were offered to the jury for its consideration, but there is no means of discerning which one the jury chose, if, indeed, it chose any of the three. The district judge found that the jury's answer accepted RECO's market definition, which as a matter of law entitled RECO to a judgment n.o.v. because of insufficient market share. We are somewhat troubled by this. Neumann had proposed an instruction giving the jury a clear choice of markets, but the district court rejected it and afforded the jury less space than it would have needed to name any of the potential markets suggested by the parties. For that reason, we are loath to affirm on the ground that the jury selected RECO's market definition. We simply are not sure. But there is a separate ground that requires affirmance of the judgment below.

The plaintiff bears the burden of establishing the relevant market. *Walker Process Equipment Co. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177–78, 86 S.Ct. 347, 350–51, 15 L.Ed.2d 247 (1965); *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). Neumann has failed to carry this burden.

One of the markets Neumann suggested —"retaining walls in all federal and state highway projects where Reinforced Earth is specified as a sole product or alternate" —is one in which RECO supposedly commands a 75% share. Neumann justifies the use of this narrow market by stating that:

If the RECO wall is deemed suitable for the project, the invitation for bids will specify that the RECO system is either required or acceptable.... Conversely, if the RECO system is not specified in the bid invitation, federal regulations preclude its use. It is thus entirely logical to define a market as consisting of those highway projects for which the RECO wall is specified.

Reply Brief for Appellants at 24.

This view fails to take account, however, of highway departments that choose not to specify RECO walls because they do not yet know of the design or because they think the job can be done better without a patented wall or with some other patented wall. RECO thus competes not just for jobs where it is specified as acceptable but competes with others to be specified in the first place. Plaintiffs offered no evidence concerning the market of highway projects for which the RECO wall could be specified. Thus, although RECO appears to win a high percentage of the contracts it bids on, this is not relevant. Neumann has pointed out that RECO, regardless of its cost advantages over conventional systems, works assiduously to broaden the acceptability of its product to public agencies, but has found it difficult to expand in the market. One witness stated his opinion that systems of RECO's general type " 'will not be broadly accepted for another five to 15 years.' " Brief for Appellants at 18. This clearly indicates that there is a much broader market than the one appellants have defined. It makes no sense to say that an entrant with a new technology has monopoly power by defining the market as those customers whom the entrant has so far managed to persuade. All new entrants, indeed most competitors, would then be monopolists. Neumann has not attempted to show that there is any reason,

other than the difficulties of expanding the market for a new product against bureaucratic inertia, why RECO has not already succeeded in the larger market or why it will not eventually penetrate that market. A market limited to projects where the RECO wall is specified is arbitrarily circumscribed and exaggerates RECO's position. *See, e.g., Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 487–89 (5th Cir.1984).

Neumann's other proposed market definition consisted of all retaining walls over twenty feet in height. Neumann never attempted to show what RECO's share of that market was. This failure condemned Neumann's market to legal insufficiency, *see Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 437 (10th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983), unless RECO's market power could be demonstrated in some other manner. Neumann insists that he did precisely this by producing evidence that RECO was able, among other things, to control prices and restrict entry. *See* Reply Brief for Appellants at 27–29. The jury verdict forecloses that argument. When asked on the special verdict form "Do you find from a preponderance of the evidence that [RECO] had monopoly power in the relevant market, that is, the ability to control price and exclude competition?", the jury answered "No." Appellants' Record Excerpts at 70.

It is clear, therefore, that Neumann failed to meet his burden of establishing a relevant market against which his claim of attempted monopolization could be tested. The judgment of the district court is, for that reason,

*Affirmed.*