REMINGTON PRODUCTS,
INC., Plaintiff,

v.

NORTH AMERICAN PHILIPS
CORPORATION, et al.,
Defendants.

Civ. A. No. B–82–56 (RCZ).

United States District Court,
D. Connecticut.

Feb. 3, 1989.

On Motion for Reconsideration
July 10, 1989.

Thomas P. Meehan, David Barmak, Randell C. Ogg, Sherman, Fox, Meehan & Curtin, P.C., Washington, D.C., Dennis N. Garvey, Garvey and Walsh, P.C., New Haven, Conn., for plaintiff.

William E. Willis, Garrard R. Beeney, Sullivan & Cromwell, New York City, for defendant N.V. Philips' Gloeilampenfabrieken.

Peter D. Clark, Pullman, Comley, Bradley and Reeves, Bridgeport, Conn., John S. Magney, Linda J. Soldo, John M. Bredehoft, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for defendants North American Philips Corp. and N.V. Philips' Gloeilampenfabrieken.

Joseph T. Gormley, Jr., Suzanne E. Baldasare, Marsh, Day & Calhoun, Bridgeport, Conn., for defendant Schick Inc.

Robert M. Langer, Elena S. Boisvert, Hartford, Conn., for Office of Atty. Gen., State of Conn.

## RULING ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY JUDGMENT

ZAMPANO, Senior District Judge.

## I. INTRODUCTION

This is a private antitrust action initiated by plaintiff Remington Products, Inc. ("Remington"), against defendants North American Philips Corp. ("NAPC"), N.V. Philips Gloeilampenfabrieken ("N.V. Philips"), and Schick, Inc. ("Schick") for alleged violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The suit arises from the acquisition of the SCHICK electric shaver assets by NAPC. Remington seeks monetary damages and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and Sections 3 and 4 of the Connecticut Anti-Trust Act, Conn.Gen.Stat. §§ 35–26, 35–27.

## II. BACKGROUND

### A. The Parties

Remington is a Delaware corporation which was organized in 1978 for the purpose of acquiring Sperry Corporation's electric shaver assets. This acquisition was completed in 1979, and since that time Remington has proceeded to manufacture and sell men's and women's electric shavers under the REMINGTON trademark and brand name. It manufactures its electric shavers in the United States.

NAPC is a Delaware corporation with its headquarters in New York City. Among the principal products of the company are its men's and women's electric shavers sold under the NORELCO trademark and brand name and manufactured in Europe by N.V. Philips. In 1982, as a follow-up to its acquisition of the SCHICK brand name and electric shaver assets for $1,800,000.00,

NAPC established U.S. Appliance Corporation as a wholly owned subsidiary for the purpose of marketing Schick shavers in the United States.

N.V. Philips is a Dutch international conglomerate owned by N.V. Gemeenshcappelijk Bezit Philips' Gloeilampenfabrieken, a holding company whose shareholders are the beneficiaries of the United States Philips Trust, which owns 62% of the stock of NAPC. It manufactures electric shavers for sale to consumers through various affiliated companies such as NAPC. It provides to NAPC all of the NORELCO electric shavers sold by NAPC in the United States, and now also manufactures and sells to U.S. Appliances Corporation all SCHICK brand electric shavers sold in the United States.

Schick is a Delaware corporation with its headquarters in Westport, Connecticut. It is a public company with 73% of its stock held by the Hermitage corporation of which James W. Hart, Schick's chairman, is a principal. Until 1982, Schick was principally engaged in the business of selling electric shavers and personal care products under the SCHICK trademark and brand name.

### B. Facts

#### 1. Pre–Acquisition Events

Throughout the 1960's and 1970's SCHICK, along with NORELCO, REMINGTON and SUNBEAM, were the four principal electric shaver brands in the United States. Defendants' Appendix 30. During the fifteen-year period from 1965 to 1980, the electric shaver industry was experiencing serious problems including declining sales,[1] substantial cost increases,[2] and strong competition from the wet shaver industry.[3] This resulted in reduced advertising expenditures,[4] low returns for retailers and a concomitant deemphasis of electric shavers by the retail trade in general.

NAPC, owner of the NORELCO trademark and brand name, markets NORELCO rotary type electric shavers. Although NAPC's market share of electric shaver sales increased during the 1970's, its total sales decreased due to the general decline in the electric shaver industry.[5] Furthermore, NAPC's cost in marketing NORELCO shavers increased because of the considerable expense in producing the rotary type electric shaver.[6]

Remington, then owned by Sperry Corporation, also suffered from problems common to the industry. However, in 1979, Victor Kiam acquired the REMINGTON trademark and brand name, and, under his leadership, proceeded to redirect the company, pursuing a vigorous marketing and advertising effort. Mr. Kiam was able to make substantial cost-reductions and significantly reduce the price of REMINGTON electric shavers.[7] This was partly

1. For example, sales of men's electric shaver declined from 6.5 million units sold in 1966 to 4.4 million units sold in 1979. Defendants' Appendix 30 at 7.

2. See Plaintiff's Exhibit 111 and Defendants' Appendix 34.

3. The majority of men and women in the United States use wet shaving instruments as compared to electric shaving systems. In the 1970's significant innovations in wet shaving products together with huge wet advertising expenditures caused electric shaver sales to decline. Reynolds Deposition at 140–42; Defendants' Appendix 30, 31 and 32; Plaintiff's Exhibit 224 and 264.

4. Schick, Sunbeam and Remington reduced their advertising expenditures from 1976 to 1978. NAPC, marketing the NORELCO brand

electric shaver, was the only company that increased its advertising expenditures consistently from 1976 to 1978. Defendants' Appendix 33 at 5.

5. "For example, from 1972 to 1980, NAPC's share of men's electric shaver sales rose from 44% to 60% and its share of ladies shaver sales went from 13% to approximately 40%, but its total unit sales of electric shavers declined from 3,011,000 to 2,981,000 pieces." Defendants' Appendix 30.

6. Rotatracts, which must be installed in the rotary type shaver, add to the expense of producing the rotary type shaver. The foil type shaver, which does not require rotatracts, is less expensive to produce. Peterson Deposition at 87–88.

7. In 1978, Remington's lowest priced shaver cost $38.98. In 1982, RPI had reduced the same

due to the fact that Remington produced foil type electric shavers which are significantly less costly to manufacture than rotary type electric shavers.

Schick, another leading manufacturer of foil type electric shavers, also suffered serious problems during this period, which eventually led to the sale of its electric shaver assets.

### 2. *The Schick Acquisition*

In the mid–1970's Schick encountered extreme financial difficulties,[8] and, by 1979, Schick closed its manufacturing plant in Lancaster, Pennsylvania, sold out its entire inventory of electric shavers, and withdrew its authorized service dealerships. Mckane Deposition at 23 and 25; Hart Deposition at 44. In that same year Windmere Corporation offered $2,500,000.00 for Schick's electric shaver and personal care assets. Friedson Deposition at 219. The offer fell through, however, when Schick sold its personal care assets portion of the business to Warner–Lambert. Id. at 243. In 1980, Schick's creditors filed for involuntary bankruptcy because of Schick's failure to pay its debts as they became due. Defendants' Appendix 7 at 1, 20 and 21; Plaintiff's Exhibit 4 (Schick Inc. 1980 Annual Report). During this time Schick briefly considered reentering the electric shaver market, but instead it decided to sell the shaver business in order to pay its creditors. Defendants' Appendix 7 at 3; Mckane Deposition at 39; Hart Deposition at 75.

In 1981, Schick held discussions with Conair Corporation for the sale of the electric shaver assets; however, the sale never evolved past the discussion stage due to disagreements over the purchase price.[9] In October 1981, Schick advertised and sent letters to Chief Executive Officers of a number of companies around the country in an attempt to solicit interest in its electric shaver assets.[10] Both Remington and NAPC expressed an interest in acquiring the SCHICK trademark and brand name, and proceeded to enter into negotiations with Schick. Remington made an initial offer which was rejected by Schick.[11] Shortly thereafter, NAPC, after brief negotiations, purchased the SCHICK electric shaver assets for $1,800,000.00.

### 3. *Post–Acquisition events*

Subsequent to the acquisition, the electric shaver industry has experienced substantial growth.[12] Similarly, the SCHICK brand name has regained approximately a

---

identical product to $28.98. Kiam Deposition I at 76.

8. In 1975 Schick had an external debt of approximately $40,000,000.00 and suffered from problems including excessive costs, low brand loyalty in the electric shaver business and the perception that SCHICK brand electric shavers were not of good quality. Hart Deposition at 20–21. Schick had a shareholder deficit of 12.1 million in 1975, 14.2 million in 1976, and 18.7 million in 1977. Defendants' Appendix 1 (Schick Inc. 1976, 1977 Annual Report).

9. Conair sought the purchase of Schick's electric shaver trademark and parts business. McKane Deposition at 49. However, Conair could not meet Schick's demand of $3,000,000.00, $2,000,-000.00 million of which would have to be in cash. Id. at 95–96. Defendants contend that Conair's decision not to purchase Schick does not reflect that Conair has no intention of entering the electric shaver market. In fact, defendants maintain that Conair's President, Leeandro Rizzuto, testified that Conair may still enter the electric shaver market. Rizzuto Deposition at 63.

10. Schick contacted firms that it considered recent or possible entrants into the electric shaver business in the United States. These firms included Hitachi, Panasonic, Krups and Sanyo. None of these firms showed any interest in Schick's electric shaver trademark or assets. McKane Deposition at 365–66.

Schick did receive a $1,000,000.00 offer from a Canadian Corporation called the Prussian Corporation. Apparently, Schick would have accepted the offer if it received no other offer. Id. at 206.

11. RPI offered $750,000.00 in cash for the shaver tooling, $250,000.00 for the patents, know how, customer lists and trademark, with an additional $250,000.00 over 3 years for a covenant from Schick not to compete. RPI also offered Schick a 5% royalty on sales (at a minimum of $450,000.00) payable over a three year period. McKane Deposition at 218; Defendants' Appendix 17.

12. The total sales in the electric shaver market increased from 4.4 million units sold in 1981 to 7.0 million units in 1984. Defendants' Appendix 36.

4% share of the men's electric shaver market, and a 15% share of the women's electric shaver market. In addition, REMINGTON and NORELCO continue to be leading brands in the industry, while the Sunbeam Corporation, with its SUNBEAM brand, exited the United States electric shaver market in 1983.

New companies have also entered the electric shaver market since the SCHICK acquisition including Krups, Panasonic, Sanyo, Hitachi and Braun. Defendants' Appendix 41 and 42. In 1984, Windmere Corporation ("Windmere") acquired a license to use the RONSON brand name for electric shavers and began selling both foil and rotary type electric shavers under that brand in the United States. Defendants' Appendix 38.

### C. General Contentions

Remington asserts that the purchase of the SCHICK trademark and brand name by defendants NAPC and N.V. Philips violates Section 7 of the Clayton Act by substantially lessening competition, restraining trade, and tending to create a monopoly in the electric shaver market.[13] The acquisition, it contends, will significantly increase concentration in an already concentrated market, thus causing the barriers to entry into the electric shaver market to increase. Also, plaintiff alleges that because NAPC's dominant position has been enhanced by the acquisition, plaintiff will suffer injury to its rate of growth, market share, and profitability in the electric shaver industry. Plaintiff further argues that this harm would not occur had another company acquired the SCHICK electric shaver assets.

NAPC and N.V. Philips respond that NAPC's purchase of the Schick assets did not eliminate a direct competitor, because Schick had not been an active competitor at the time of acquisition and for several years prior thereto. For these reasons, defendants argue, even assuming the existence of an electric shaver market characterized by high barriers to entry, the acquisition was and is not likely to substantially lessen competition in the electric shaver industry. Moreover, defendants contend, the injury and threatened injury claimed by Remington is not antitrust injury which is necessary for relief under Sections 4 and 16 of the Clayton Act. Finally, defendants assert that the plaintiff is barred from bringing this lawsuit because of a release signed by plaintiff in a previous lawsuit.[14]

### D. Procedural Setting

Remington now moves for partial summary judgment on the following issues: (1) the relevant market; (2) the defendants' liability under Section 7 of the Clayton Act; (3) the plaintiff's right to seek equitable relief under Section 16 of the Clayton Act, (4) the plaintiff's right to seek divestiture or recision of NAPC's acquisition of Schick; and (5) the effect of NAPC's settlement of a previous action between Remington and NAPC.

Defendants oppose the motion arguing that there are material facts in dispute. Defendants also cross-motion for summary judgment on the issue of liability under Section 7 of the Clayton Act alleging that resolution of the factual disputes is not required, even if they are decided in favor of the plaintiff, because NAPC's acquisition failed to eliminate any actual or potential competition. In addition, defendants move for summary judgment on the ground that there has been no antitrust injury which is a prerequisite under Sections 4 and 16 of the Clayton Act.

### III. DISCUSSION

Fed.R.Civ.P. 56(c) provides that summary judgment shall be rendered only when a

---

**13.** The State of Connecticut, as amicus curiae, has filed a memorandum in support of plaintiff's Partial Motion for Summary Judgment, arguing that defendants have violated Section 7 of the Clayton Act.

**14.** In 1979, NAPC brought suit against Remington based on trademark infringement. Remington counterclaimed alleging monopolization and unfair competition. *See North American*

*Philips Corp., v. Remington Products Inc.,* C.A. No. B–79–254 (D.Conn.1982). Evidently, Remington signed an agreement releasing NAPC from any claim, "known or which reasonably should be known, related to the civil action and alleged antitrust violations or unfair competition alleged therein." Defendants' Appendix 64 (Release § 8).

review of the entire record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A "material fact" is one whose resolution will affect the ultimate determination of the case. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party opposing summary judgment must provide a factual basis for its allegations and may not rely on "mere speculation or conjecture as to the true nature of the facts." *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. Even though both sides have filed motions for summary judgment, this does not require that the court grant judgment as a matter of law for one side or the other. *Schwabenbauer v. Board of Education,* 667 F.2d 305, 314 (2d Cir.1981).

■ Summary judgment "should be used sparingly in complex antitrust litigation." *Poller v. Columbia Broadcasting Co.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Nevertheless, a motion for summary judgment is appropriate to resolve an antitrust case when no genuine issues of material fact exist. *See First Nat'l. Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Reborn Enterprises Inc., v. Fine Child Inc.,* 590 F.Supp. 1423 (S.D.N.Y.1984), *aff'md,* 754 F.2d 1072 (2d Cir.1985); *See e.g. S.E.C. v. Research Automation Corp,* 585 F.2d 31, 33 (2d Cir.1978).

### A. Effect of the Release in the Previous Action

As a preliminary matter the Court must determine the effect of a release which was executed in a previous action between NAPC and Remington.

In *North American Phillips Corp., v. Remington Products Inc.,* C.A. No. B–79–254 (D.Conn.1982), NAPC instituted a trademark infringement claim against Remington, which in turn set forth a counterclaim alleging monopolization and unfair competition. The parties settled these claims by executing an agreement which released NAPC from any claims, "known or which reasonably should have been known, related to the Civil Action and alleged antitrust violations or unfair competition alleged therein." *See* Release § 8, Defendants' Appendix 64.

Remington moves for summary judgment on the effect of this release to the present litigation. First, it contends that the language of § 8 of the release clearly indicates that the release was never intended to apply to the acquisition herein. Second, the purchase of Schick, it maintains, is totally unrelated to the previous action and therefore does not fall within the scope of the release. Finally, Remington argues that Richard Kess, President of NAPC's Consumer Products Divisions, asserted in deposition testimony that the release agreement was not intended to operate as a bar to Remington's claims in this case.

Defendants oppose plaintiff's motion for summary judgment contending that the present antitrust claim relates back to the antitrust claim in the prior lawsuit. In conjunction with this, defendants argue that there is a triable issue of fact in determining whether plaintiff had actual knowledge of the Schick acquisition; therefore, defendants maintain that summary judgment is inappropriate in the present matter. In addition, defendants claim that the release clearly releases defendants from liability based on the pre-release acquisition.

■ "In construing the scope and effect of a release, the intent manifested by the parties must govern." *Concepcion v. United States Navy,* 575 F.Supp. 23, 25 (S.D.N.Y.1983); *See also Ruskay v. Jensen III.,* 342 F.Supp. 264, 271 (S.D.N.Y.1972), *aff'm'd sub nom, Ruskay v. Waddell,* 552 F.2d 392, 395 (2d Cir.1977), *cert. denied* 434

U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The parties' intentions may be determined by looking at the specific language of the release and "circumstances surrounding its execution." *Ruskay*, 552 F.2d at 395–96.

■ Upon viewing the language of the release and relevant circumstances, the Court holds that § 8 of the release does not bar Remington from initiating the present action. According to the specific language of § 8 the only claims that are barred are those claims which are related to the previous civil action and violations alleged therein. The plain meaning of this language indicates that the intention of the parties was to limit the release to matters which only concerned that previous action. In the Court's opinion, the present action is totally unrelated to the claims and alleged antitrust violations in the previous civil action.

In the former action, plaintiff's antitrust counterclaim occurred two years before the Schick acquisition. Furthermore, even if defendants' assertions are correct and plaintiff did know, or should have known, of the Schick acquisition, this does not change the result. Because plaintiff's current claim is unrelated to the previous claim, whether plaintiff knew or should have known of the Schick acquisition is irrelevant. Similarly, the Court finds no merit in defendants' argument that they are relieved from liability because the acquisition occurred prior to the execution of the release. As held previously, plaintiff's current claim is unrelated to the previous antitrust action; therefore, whether the acquisition occurred before the execution of the release is not a dispositive factor.

For the reasons stated above, Remington's motion for summary judgment on this issue is GRANTED.

**B. Violation of § 7 of the Clayton Act**

Section 7 of the Clayton Act is the fundamental antitrust statute in determining whether a merger or acquisition is unlawful. This section states in pertinent part: "No person ... shall acquire the whole or any part of the assets of another person ... when in any line of commerce ... in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18. The purpose of the provision is to prevent an acquisition in which there is a *reasonable probability* that it will substantially lessen competition or create a monopoly. *United States v. du Pont & Co.*, 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1956).

■ One type of acquisition, which is frequently challenged as a violation of Section 7, is the horizontal merger. This type of merger involves the acquisition of the stocks or assets of one competitor by another. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). When analyzing a horizontal merger under Section 7, the court must "describe the companies involved, analyze the product and geographic market in which they compete, and explore the structure of the industry affected by the merger to the end that [the court] may properly assess the probable effects of the merger on competition." *Stanley Works v. FTC*, 469 F.2d 498, 499 (2d Cir.1972). Since the Court has already described the companies involved in the background section of this opinion, it will proceed to analyze the relevant market.

**1. *Relevant Market***

■ Section 7 prohibits acquisitions which may substantially lessen competition or tend to create a monopoly "in any line of commerce in any section of the country." 15 U.S.C. § 18. The courts have concluded that this language refers to a relevant market which has both product and geographic boundaries. Establishing a relevant market is a prerequisite in determining whether the acquisition has substantially lessened competition. *du Pont*, 353 U.S. at 593, 77 S.Ct. at 877. In order to establish the relevant market it is necessary to first determine the geographic market and the relevant product market.

Because all parties concede that the United States is the relevant geographic market, the Court need not involve itself in any further discussion of this requirement.

Remington contends that the relevant product market is the electric shaver industry. Defendants counter by alleging that the relevant product market encompasses the entire shaving industry which includes both wet blades and electric shavers.

"The Supreme Court has stated that the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Fletcher, *Cyclopedia of the Law of Private Corporations,* vol. 10A at 236 (Perm.Ed.1986) (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In other words, cross-elasticity means that there is another product in the market which is fungible or may act as a substitute for the product in question. Thus, if the price of one product is increased, and the consumers would turn to another product to achieve the same results, the products are considered "reasonably interchangeable." *See United States v. Aluminum Co.,* 377 U.S. 271, 276–77, 84 S.Ct. 1283, 1287, 12 L.Ed.2d 314 (1964).

Remington argues that there is no cross-elasticity between electric shaver and wet blades, nor is there any evidence that slight increases in the price of electric shavers would cause the consumer to purchase wet blade shavers. Defendants respond that Victor Kiam testified that he views the shaver market as "price elastic" and that overall industry sales are increased through lower prices. Kiam Deposition I at 92. Defendants further maintain that other facts prove that electric shavers are reasonably interchangeable with wet blades. For example, defendants claim that when electric shaver prices were rising throughout the 1970's electric shaver sales decreased. Likewise, when prices dropped in recent years electric shaver sales increased. Defendants submit that this evidence raises a material issue of fact which renders summary judgment on the issue of a relevant product market inappropriate.

"A pronouncement as to market distinction is not one of law but of fact ..." *Jennings Oil Co. v. Mobil Oil Corp.,* 539 F.Supp. 1349, 1352 (S.D.N.Y.1982) (*quoting Columbia Metal Culvert Co. v. Kaiser Aluminum Chemical Co.,* 579 F.2d 20, 28 (3rd Cir.1978), *cert. denied* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978)). The genuine issue of a material fact concerning the relevant product market renders partial summary judgment inappropriate. *Hayden Publishing Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 70 (2d Cir.1984).

In the present matter there is evidence which would support a finding that the relevant product market is either the entire shave industry, or just the electric shaver industry. Remington argues in the alternative, however, that even if the relevant product market is not determined to encompass only electric shavers, electric shavers may still be considered a submarket for product market purposes.

It is well established that a submarket may exist within a broader market. *See United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). Remington contends that according to these factors the electric shaver industry must at least be considered a submarket. In support of this proposition, plaintiff claims that there are separate market share reports for electric shaver and wet blades, that the defendants always refer in their documents to the electric shaver market, that the two products are distinct in their appearance and operation, that the products are produced in distinct facilities, that the prices of the two are distinct, and that the two products are sold through different distribution networks.

Based on these facts, and common sense, there is no doubt that at least a submarket exists for antitrust purposes.

Therefore, although there is a genuine factual dispute as to whether the electric shaver industry is a relevant product market, the Court concludes that it is at least a viable submarket which will suffice in determining the overall relevant market.

Under these circumstances, plaintiff's motion for summary judgment is GRANTED on the issue of relevant markets.

## 2. *Substantial Lessening of Competition*

Once the relevant market has been established the next step is to determine whether the acquisition will have anti-competitive effects. Section 7 of the Clayton Act states that the acquisition is unlawful if "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. As stated hereinbefore, this provision has been interpreted by the courts to mean that an acquisition is unlawful if there is a *reasonable probability* that the acquisition will substantially lessen competition or tend to create a monopoly. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967).

In applying this test courts must look at the "particular market involved, its structure and history and probable future." *United States v. Continental Can Co.*, 378 U.S. 441, 458, 84 S.Ct. 1738, 1748, 12 L.Ed.2d 953 (1964). Although market shares are the "primary indicia of market power" courts may view other economic and historical factors. *Id.* at 458, 459. These factors may include: (1) concentration in the industry; (2) ease of entry into the market; (3) strength of remaining firms; (4) supply and demand in the market; and (5) post-acquisition events. *See* 5A Cavitch, *Business Organizations*, § 105B.03[3] (1988).

In the matter *sub judice*, Remington advances three arguments in support of its position that the acquisition of Schick will substantially reduce competition. First, plaintiff argues that NORELCO is the dominant brand in a highly concentrated electric shaver market. Second, plaintiff maintains that the SCHICK brand was and is a significant asset in the electric

shaver market. Finally, plaintiff alleges that entry into the market is difficult.

In response to plaintiff's contentions, defendants contend that no competition has been eliminated by the acquisition, that NORELCO is not the dominant brand in the market, and that entry into the electric shaver market is relatively easy. Defendants also challenge plaintiff's position concerning the value of the acquired SCHICK brand name both prior to and subsequent to the acquisition.

Because it is evident that serious factual disputes exist concerning whether the acquisition substantially lessened competition, the Court finds that summary judgment is inappropriate on the issue of liability under Section 7 of the Clayton Act; therefore, plaintiff's and defendants' motion for partial summary judgment on the issue of liability under Section 7 of the Clayton Act is DENIED.

### C. Antitrust Injury

Defendants contend that even if Remington establishes that the purchase of Schick was illegal under Section 7 of the Clayton Act, plaintiff is not entitled to relief under Sections 4 and 16 of the Clayton Act because plaintiff has not suffered from an antitrust injury.

Once a violation of Section 7 is established the plaintiff may be entitled to equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and/or monetary relief under Section 4 of the Clayton Act, 15 U.S.C. § 15. The requirements under both sections are substantially different. For example, when claiming monetary damages under Section 4 the complaining party must show "actual injury" to its business or property. 15 U.S.C. § 15. Conversely, one seeking equitable relief under Section 16 need only show "threatened" loss or damage. 15 U.S.C. § 26

Before a party is entitled to relief under either of these sections, it must establish that the alleged injury, or threat of injury, is "antitrust injury." *Cargill Inc., v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986); *Brunswick Corp. v. Pueblo*

*Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Antitrust injury is an "injury of the type the antitrust laws were designed to prevent ..." *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. The analysis in determining whether antitrust injury exists is identical under both section 4 and 16. *Cargill,* 479 U.S. at 112–13, 107 S.Ct. at 490–91.

Thus, as a preliminary matter, the Court must determine the nature of plaintiff's alleged injury. From what can be discerned from plaintiff's briefs, it contends that NAPC purchased Schick's electric shaver assets with the specific intent to injure the plaintiff and reduce competition. Plaintiff's Response Memo To Defendants' Supplemental Memo at 14. As a result, plaintiff claims that it will lose sales and profits.

The next step is to determine whether this alleged injury is of the type the antitrust laws were designed to prevent. The recent Supreme Court decision in *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), is instructive.

In *Cargill,* the fifth largest beef packer in the United States, Monfort of Colorado ("Monfort"), challenged a merger between the second largest beef packer in the United States, Excel Corporation ("Excel"), and the third largest beef packer in the United States, Spencer Beef. *Cargill,* 479 U.S. at 106, 107 S.Ct. at 487. Monfort sought injunctive relief under Section 16 of the Clayton Act based on two theories of "threatened injury." *Id.* at 107, 107 S.Ct. at 487. Under the first theory, Monfort alleged that it was threatened with loss of profits due to defendants increased market power. *Id.* at 113–14, 107 S.Ct. at 491. It maintained that Excel would now have the ability to "lower its prices to some level at or slightly above its costs" in order to compete with other packers for market share. *Id.* at 114, 107 S.Ct. at 491. This increase in competition, Monfort argued, would

force it to lower its prices in order to remain competitive. *Id.* It further asserted that smaller businesses which lacked significant reserves would be driven from the market.[15] In holding that this increased competition did not constitute antitrust injury the Supreme Court stated:

> The kind of competition that Monfort alleges here, competition for increased market share, is not actively forbidden by the antitrust laws. It is simply, as petitioners claim, vigorous competition. To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." *Arthur S. Langenderfer v. S.E. Johnson Co.,* 729 F.2d 1050, 1057 (CA6), cert. denied, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984).

*Cargill,* 479 U.S. at 116, 107 S.Ct. at 492.

Alternatively, Monfort argued that Excel was engaging in predation. *Id.* at 117, 107 S.Ct. at 493. "Predation involves deliberate seeking of monopoly power by means other than superior efficiency, by means that would not be employed in normal course of competition." *Neumann v. Reinforced Earth Co.,* 786 F.2d 424, 427 (D.C. Cir.1986). Monfort claimed that Excel was engaging in a particular form of predation known as predatory pricing. *Cargill,* 479 U.S. at 117, 107 S.Ct. at 493. "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Id.* Although the Supreme Court in *Cargill* did in fact recognize that predatory pricing was a practice forbidden by the antitrust laws, *id.* at 121, 107 S.Ct. at 495, it held that the claim was invalid since Monfort did not allege injury from below-

---

**15.** The Supreme Court noted that Monfort "conceded that its viability would not be threatened by Excel's decision to lower prices." *Id.* at 115 n. 10, 107 S.Ct. at 492 n. 10. Whether the Court

would have found antitrust injury to exist if plaintiff alleged that it would go out of business is debatable.

cost pricing before the district court. *Id.* at 119, 107 S.Ct. at 492. Furthermore, the Court maintained that there was no evidence in the record to support that it did raise a claim of predatory pricing.[16]

Plaintiff maintains that the present case is distinguishable from *Cargill* because NAPC acquired the SCHICK assets with the intent of injuring the plaintiff and reducing competition. Such an intent, plaintiff contends, is a purposeful anti-competitive practice and will result in predatory consequences. Plaintiff's Memo In Response To Defendants' Further Supplemental Memo at 16. In support of this allegation plaintiff offers evidence to show: (1) that in approving the acquisition of Schick, NAPC expressed concern about Remington's recent aggressive price cutting and the need to combat such policies because NAPC could no longer increase its prices at will, Pl. Exh. 82 at 102926; (2) that N.V. Philips complained that Remington's competitive pressures were undermining defendants' ability to dictate electric shaver prices, Pl. Exh. 304 at P6225; (3) that NAPC would use SCHICK to inhibit RPI's growth, Pl. Exh. 82 at 102930; (4) that "defendants intended to hit [Kiam] right in the breadbasket", Pl. Exh. 43; and (5) that the purchase of Schick was designed to replace REMINGTON models in stores with SCHICK models, Pl. Exh. 352 at 6218.

Defendants respond that even if these facts are true and NAPC acquired SCHICK with the intent of taking sales away from plaintiff, this intent is not a purposeful anti-competitive practice. Furthermore, defendants argue that plaintiff, although complaining of reduced competition, is actually complaining of increased competition which, in light of *Cargill,* is not considered antitrust injury.

After careful consideration, the Court agrees with defendants' contentions. For purposes of summary judgment, the facts must be viewed in the light most favorable to the non-moving party. *Anderson,* 477

U.S. at 255, 106 S.Ct. at 2313. In the matter *sub judice* plaintiff's main point is that NAPC, a dominant entity in the electric shaver market, acquired the SCHICK assets with the intent to take sales away from plaintiff and to reduce competition.[17] Even if this is true, the mere fact that a competitor wishes to take sales away from another competitor in order to increase its own market power does not show a purposeful anti-competitive scheme. "The antitrust laws were enacted for the protection of *competition,* not *competitors." Cargill,* 479 U.S. at 115, 107 S.Ct. at 492, (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). This crucial distinction would become meaningless if the plaintiff's position were sustained.

Plaintiff also attempts to find antitrust injury by relying on several cases in which the courts found that antitrust injury existed. However, these cases are distinguishable for several reasons. First, all of these cases were decided prior to *Cargill.* Second, and more important, in each of these cases the court concluded that some specific activity constituted a purposeful anti-competitive scheme. For example, in *Blue Shield v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Supreme Court found that Blue Shield had engaged in a purposeful anti-competitive scheme by refusing to reimburse subscribers for psychologists' services. The plaintiff alleged that "Blue Shield sought to induce its subscribers into selecting psychiatrists over psychologists for psychotherapeutic services." *Id* at 483, 102 S.Ct. at 2550. The Court determined that this purposeful illegal boycott constituted antitrust injury. *Id.* at 483–84, 102 S.Ct. at 2550–51. Similarly, in *Aspen Skiing Co. v. Aspen Highlands Skiing,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), the Supreme Court determined that an unlawful refusal to deal constituted a predatory practice. *Id.* 105 S.Ct. at 2854. In *Christian Schmidt*

---

**16.** The Supreme Court concluded that Monfort had made only "four passing references, three in deposition testimony, to the possibility that Excel's prices might dip below costs." *Id.* at 119.

**17.** For example, plaintiff states that NAPC acquired the SCHICK assets with the specific purpose of injuring plaintiff, or punishing plaintiff for reducing shaver prices. The Court interprets this language to mean that NAPC intended to take sales and profits away from plaintiff.

*Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354 (6th Cir.1985), the Sixth Circuit Court of Appeals concluded that a merger between two brewing companies would result in an anti-competitive consequence, because it would induce distributors to drop smaller brewers as customers. *Id.* at 1357. The court reasoned that the merged brewers' dominance would create this power of inducement. *Id.* Also, in *Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785 (2d Cir.1983), the Second Circuit held that AT & T had devised and filed bad faith tariffs which were purposefully designed to exclude competitors. *Id.* at 804–05. Finally, in *Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C.Cir.1986), the court held that entering into sham litigation constituted a purposeful anti-competitive practice. *Id.* at 427.

These cases clearly establish, as does *Cargill*, that a anti-competitive *practice* forbidden by the antitrust laws is necessary to establish antitrust injury. Conversely, none of these cases holds that a mere intent to take sales away from a competitor, without some type of predatory conduct, satisfies the antitrust injury requirement. In the present case there is no allegation of predatory pricing, illegal boycotts, or wrongful pricing agreements, nor are there any facts which tend to support such allegations. Therefore, plaintiff's contention that a mere intent to take sales away from plaintiff constitutes a predatory practice must be rejected.

Additionally, plaintiff alleges that the acquisition was designed to inhibit plaintiff's growth and strengthen NAPC's control over the electric shaver market, and that this establishes an intent on the part of NAPC to reduce competition. As a result of this intent to reduce competition, plaintiff contends that it will lose profits. The Court finds no merit in this contention. If plaintiff is complaining that NAPC intended to take sales away from plaintiff, then it must be complaining of increased competition, not reduced competition.[18] In essence, plaintiff is making the same argument that was made in *Cargill*. Plaintiff fears that NAPC's increased market share will result in a loss of business. However, as the Court held in *Cargill*, this potential loss of profits is the result of increased competition. *Cargill*, 479 U.S. at 116, 107 S.Ct. at 492.

Plaintiff's attempt to distinguish the present case from *Cargill* by adding the element of intent is unpersuasive.[19] NAPC may have intended to take sales away from plaintiff; however, it seems clear that NAPC attempted to do this through increased competition, not reduced competition. The *Cargill* ruling that lost profits due to vigorous competition, even if it increases market share, does not constitute antitrust injury, controls the issue here. *Cargill*, 479 U.S. at 115, 107 S.Ct. at 492.

For the reasons stated above, defendants' motion for summary judgment on the issue of antitrust injury must be GRANTED as a matter of law.

### D. Remington's Right to Divestiture or Recision

Because plaintiff has failed to establish antitrust injury, the Court need not decide this issue.

18. Plaintiff maintains that it will only suffer from lost profits. This clearly shows that plaintiff fears increased competition. If plaintiff alleged that the acquisition would cause its demise, then it is possible that the acquisition would reduce competition since it is actually eliminating a competitor. However, since plaintiff is merely complaining of lost profits the Court concludes that the plaintiff fears increased competition.

19. Plaintiff also argues that competition would not be reduced if a third party were allowed to acquire the Schick assets, because a third party would compete against both companies. This argument is faulty for two reasons. First, plaintiff is assuming that the third party would manufacture both foil and rotary type shavers. If the acquiring party only manufactured foil type shavers then it would suffer from the same loss of profits had NAPC acquired the Schick assets. Second, assuming plaintiff is correct and the acquisition of the Schick assets by a third party would cause a lower loss of profits to plaintiff, the antitrust laws are not designed to provide relief to a competitor that desires less competition. In fact, this argument confirms the Court's position that plaintiff is actually concerned of an increase in competition. Plaintiff prefers to have a third party acquire the Schick assets because it would cause less of an increase in competition.

## IV. CONCLUSION

Plaintiff's motion for partial summary judgment as to the effect of the release in the previous action, and the relevant markets is GRANTED. Plaintiff's motion for partial summary judgment, and defendants' cross-motion for partial summary judgment on the issue of liability under Section 7 of the Clayton Act are both DENIED. Defendants' motion for summary judgment as to antitrust injury is GRANTED.

SO ORDERED.

## ON MOTION FOR RECONSIDERATION

### Introduction

On February 3, 1989, this Court issued a ruling granting defendants' motion for summary judgment on the issue of antitrust injury. In light of the Second Circuit's recent opinion in *Bigelow v. Unilever*, 867 F.2d 102 (2nd Cir.1989), plaintiff now moves for reconsideration pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, seeking to modify the Court's ruling with respect to this issue.

### Background

In its previous ruling the Court held that plaintiff had failed to show any evidence of antitrust injury. In reaching this conclusion, the Court relied on the decision rendered in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), wherein the United States Supreme Court determined that a party did not have standing to assert an antitrust claim when it was threatened with suffering lost profits due to increased competition, and when it failed to demonstrate some type of predatory practice.

Plaintiff's main argument in the matter *sub judice* is that it would lose profits due to defendants' intent to reduce competition. This Court found, however, that plaintiff was not facing reduced competition, but rather was encountering increased competition. As a result, the Court concluded that plaintiff was essentially making the same argument as the plaintiff in *Cargill*. Moreover, the Court determined that plaintiff had failed to produce any evidence of

predatory activity. Therefore, the Court granted defendants' motion for summary judgment.

Plaintiff now submits that the recent opinion in *Bigelow* requires that the Court reconsider its earlier ruling and deny defendants' motion for summary judgment with respect to the issue of antitrust injury.

### Discussion

In order to understand the ramifications of *Bigelow* on this Court's earlier ruling, a brief synopsis of the Second Circuit's decision is necessary. Basically, *Bigelow* involved a proposed merger between Celestial Seasonings, Inc. ("Celestial") and Lipton, Inc. ("Lipton"). Plaintiff, R.C. Bigelow, Inc. ("Bigelow"), challenged the proposed merger contending that it violated section 7 of the Clayton Act. *Id.* at 103. Due to the proposed illegal merger, Bigelow sought injunctive relief under section 16 of the Clayton Act. *Id.* at 104.

In the district court defendants moved for summary judgment alleging that plaintiff was not threatened by any type of antitrust injury. *Id.* at 104–05. The district court agreed with defendants' position and held that Bigelow failed to raise a genuine issue of material fact with respect to whether it was threatened with antitrust injury. *Id.* at 105. To support its conclusion the district court held that although the post-market share was determined to be 84% of the relevant market, *id.* at 104, "the mere fact that Lipton will possess monopoly power after the proposed acquisition is not a sufficient showing that Lipton will exercise that power in a way that will cause injury to Bigelow." *Bigelow v. Unilever*, 689 F.Supp. 76, 79 (D.Conn.1988). In addition, the court determined that plaintiff had failed to produce any evidence of predatory pricing or a present intent to engage in predatory behavior following the merger. *Bigelow*, 867 F.2d at 105.

On appeal, the Second Circuit reversed the findings of the district court and held that antitrust injury to a competitor can be found when the market share of the merging firms threatens to be decisive. Specifically, the court concluded that a demonstrated probability that a merger will af-

 

fect competition in the relevant market is sufficient to survive a motion for summary judgment. *Id.* at 109. In distinguishing the Supreme Court's decision in *Cargill,* the court observed that *Cargill* involved a trial on the merits, whereas *Bigelow* concerned the disposition of the case on a motion for summary judgment. *Id.* The court reasoned that summary judgment is inappropriate where the market share is indicative of market power, because there is a material issue of fact as to whether the merger will result in the elimination of competition. *Id.* at 111. Thus, the court held that Bigelow was entitled to all "reasonable inferences that follow from the ... merger of substantial monopoly power ... and to a presumption that following the merger Lipton would be likely to eliminate competition in that market ..." *Id.*

In the instant case it appears that NAPC controlled 55% of the electric shaver industry subsequent to the merger. Although this is not as high as the market share in *Bigelow*, it is sufficient to establish a presumption of illegality. "A post-merger market share of 48.8% is sufficient to establish *prima facie* illegality under *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), and its progeny." *United States v. Waste Management, Inc.,* 743 F.2d 976 (2d Cir.1984). Thus, it appears that NAPC had substantial monopoly power subsequent to the merger. Because *Bigelow* mandates that all reasonable inferences must be ascertained from this *prima facie* showing of monopoly power and presumption of illegality, the Court must modify its earlier ruling and deny defendants' motion for summary judgment with respect to the issue of antitrust injury.

As a result of the Court's denial of defendants' motion for summary judgment as to the issue of antitrust injury, the Court must now address plaintiff's motion for summary judgment as to whether it is entitled to divestiture, recision or other equitable relief under § 16 of the Clayton Act. Defendants' position on this motion is that this type of relief is improper; however, defendants strongly suggest that this matter should not be determined on a motion for summary judgment. Rather, defendants contend that this matter should be decided after all the evidence is heard by way of trial.

The Court agrees with defendants' position. It is well established that the determination of a remedy is to be decided by a trial court after all the evidence has been reviewed. *Julius M. Ames Co. v. Bostich, Inc.,* 240 F.Supp. 521, 526 (S.D.N.Y.1965).

Accordingly, plaintiff's motion for summary judgment as to the issue of divestiture and other equitable relief is DENIED.

### Conclusion

For the above-stated reasons, plaintiff's motion for reconsideration is GRANTED. Upon reconsideration, defendants' motion for summary judgment as to the issue of antitrust injury is DENIED. Plaintiff's motion for summary judgment with respect to relief is also DENIED. In all other aspects this Court's ruling issued on February 3, 1989, remains in effect.

SO ORDERED.