724 A.2d 267 (1999)
318 N.J. Super. 385
VILLAGE OF RIDGEFIELD PARK, Plaintiff-Appellant,
v.
NEW YORK, SUSQUEHANNA AND WESTERN RAILWAY CORPORATION, a New Jersey Corporation, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 1998.
Decided February 17, 1999.
*268 Martin T. Durkin, Ridgefield Park, and Lewis Goldshore, Plainsboro, for plaintiff-appellant (Durkin & Boggia, Ridgefield Park and Goldshore & Wolf, Plainsboro, attorneys; Mr. Durkin, Robert J. Cash and Alison S. Kerber, Nutley, on the brief).
J.S. Lee Cohen, Teaneck, for defendant-respondent (DeCotiis, FitzPatrick & Gluck, attorneys; Kevin M. Kinsella, on the brief).
William John Kearns, Jr., General Counsel, for amicus curiae the New Jersey State League of Municipalities and the New Jersey Institute of Municipal Attorneys (Thomas W. Dunn and James V. Zarrillo of the firm Beattie Padovano, Montvale, on the brief).
Before Judges KING, WALLACE and NEWMAN.
The opinion of the court was delivered by KING, P.J.A.D.

I
This is an action by a municipality against a railroad corporation. The municipality seeks injunctive relief against an alleged public nuisance. A claim for damages also is asserted. The Village of Ridgefield Park contends that various activities by the railroad on its right-of-way and side tracks along the Hackensack River in Bergen County are annoying adjacent citizens and damaging their properties. The Law Division judge *269 denied all relief on the ground of federal preemption by railroad regulation and granted summary judgment to the railroad. We affirm, with modification. We conclude that plaintiff and the citizens must first seek relief from federal authorities, who may choose to defer, at least to some extent, to state regulation under the police powers customarily reserved to the states where citizens claim damage and oppression from a public nuisance generated by an interstate railroad. Our affirmance of the summary judgment is without prejudice to the municipality's and its citizens' rights to move to reopen the matter at the trial level, if the federal regulatory authority either declines to entertain the claim on the merits or finds justification for state action in the circumstance.

II
Plaintiff Village of Ridgefield Park (Village) in Bergen County, population 12,500, brought this complaint in four counts to enjoin defendant New York Susquehanna & Western Railway Corporation (the railroad) from using property the railroad owns as a right-of-way in plaintiff Village and now uses as a railroad maintenance facility. Before 1992 defendant's 125-foot right-of-way located in the Village consisted of a single railroad track used only for moving freight trains through the municipality. In 1992 the railroad relocated its maintenance facility from a remote section of the Borough of Ridgefield, to the south, called the Little Ferry Yard, to its right-of-way in the Village near residential homes, a funeral home, and a public park. The railroad did not obtain any construction or land-use permits from the Village and will not allow the Village to perform any routine safety, health and fire inspections on railroad facilities in the right-of-way through the Village. The railroad alleges federal preemption prevents plaintiff from invoking routine local police powers. Complaints by the Village and its residents include continuous noise from as many as a dozen idling locomotive engines near residences which occurs even into the night hours, vibration of houses caused by these idling locomotive engines, soot on homes, unpleasant odor caused by diesel fumes, bright lights during the night, fear of dangerous diesel fuel leakage if defendant's fuel tanks are not properly equipped with secondary containment systems, and a reduction in property values. Two of the four counts of plaintiff's rather generalized complaint for injunctive relief also demand judgment for compensatory damages. No local individuals, property owners, or citizens are joined as plaintiffs. The Village itself describes no particularized damage to municipal property. For this reason, we view this essentially as an action for injunctive relief.
Plaintiff raises these four issues on its appeal:
I. Whether the Interstate Commerce Commission Termination Act of 1995 addresses only the economic regulation of railroads and does not preempt the Village from exercising its police power in the areas of safety, health and welfare.
II. Whether the judge's decision in granting summary judgment to defendant on the issue of breach of contract was in error and should be reversed.
III. Whether the Appellate Division should exercise original jurisdiction under R. 2:10-5 to grant the Village summary judgment on its public nuisance claims as a matter of law.
IV. Whether the judge erred in dismissing plaintiff Village's federal Oil Pollution Act claim as a matter of law.

III
This is the procedural context. Plaintiff Village filed this complaint on November 18, 1993 against the railroad seeking an injunction to stop the railroad from operating its locomotive refueling and light-maintenance facility (facility) near the residential section. In 1992 the railroad had relocated this facility from a more remote section of the Borough of Ridgefield, to the south of the Village, known as Little Ferry Yard. The Village sought a judicial order requiring the railroad to obtain site-plan approval and other local permits and approvals, to permit municipal inspections, and to cease its annoying refueling and maintenance operations. Plaintiff further *270 alleges the railroad breached an implied contract to construct an engine house designed to minimize noise and air pollution from its maintenance operations in the Village. Plaintiff also alleged the railroad was in violation of local zoning ordinances.
On November 5, 1996 the railroad filed a motion to dismiss the complaint for failure to state a claim or in the alternative for summary judgment. The railroad's affirmative defenses included the assertion that any claims by the Village were preempted by the Interstate Commerce Commission Termination Act of 1995, were barred by failure to exhaust administrative remedies, and constituted an unconstitutional burden on interstate commerce. On February 18, 1997 the Village filed a response to defendant's motion to dismiss the complaint or summary judgment and a cross-motion for summary judgment.
On February 6, 1998 Judge Sciuto heard oral arguments and entered an order dismissing plaintiff's complaint and granting defendant's motion for summary judgment, essentially on federal preemption grounds.

IV
The railroad is a "common carrier engaged in the business of transporting goods in interstate commerce." Since 1893 the railroad had used a site called "The Little Ferry Yard" as its railroad terminal. This yard was located in the Borough of Ridgefield, more remote from local residences and south of Overpeck Creek, the border between the Borough and the Village, and also on the Hackensack River. This "Little Ferry Yard" consisted of a roundhouse, turntable, sand tower, maintenance facility and various shops used to service and maintain railroad equipment. In the 1980's the railroad expanded the Little Ferry Yard "to accommodate additional freight traffic" and unloading of cargo in the yard. The railroad also owned the subject 125-foot right-of-way, traversing the western edge of the Village along the course of the Hackensack River in an area zoned I-1 for "light industrial" uses. Prior to 1992 the right-of-way in the Village had consisted of one track used for freight trains to pass through. To the east, between the bluff and immediately adjacent to defendant's right-of-way in the Village, Conrail owns a single-track right-of-way used for through-train traffic only. The railroad's right-of-way in the Village is bordered on the west by the Hackensack River and a strip of light-industrial uses along the bank of the river. The heavily-traveled Ridgefield Avenue and Bergen Turnpike is to the east of the Conrail track. The residential area and small park subject of the plaintiff's complaint on behalf of its citizens sits on a high bluff, just east of Ridgefield Avenue and the Bergen Turnpike. The north boundary of the precise site of the railroad's servicing, maintenance, switching and other operations in the Village right-of-way is the overpass of State Highway 46. Interstate Route 80 is several hundred yards north of Highway 46. Interstate 95 is about one-half mile to the east of the facility.
In 1991 the railroad sold its Little Ferry Yard and railroad terminal to CSX Rail Systems (CSX) for twenty-one million dollars so it could "benefit from additional rail traffic from the CSX operations into the Ridgefield site." After the sale, CSX refused to allow the railroad to continue its refueling and light-maintenance operations at the Little Ferry site at the Borough of Ridgefield. This required the railroad to relocate its so-called "light-maintenance" facility to its approximately 125-foot right-of-way located in the Village, where some side-track was added.
Plaintiff alleged that in May and June of 1992 the railroad began constructing several new facilities on the Village site: a thirty to forty-foot sand tower, together with permanent installation of fuel oil tank cars, pumps to distribute the fuel oil, a servicing or lube oil tank, and permanent railroad boxcars used as shops, offices and septic and sanitary facilities. The railroad did not obtain any zoning or construction permits for these improvements. The railroad admits that refueling and servicing takes place at the Village site; this includes: "adding diesel fuel to the fuel tank of the locomotive; adding engine oil to the crankcase; adding water to the radiators; and adding sand to the on-board holding tanks for traction in wet rail conditions." Recently, a permanent fuel tank was installed, *271 allegedly with secondary containment safeguards, which defendant asserts now meets EPA approval.
[This section, containing a very detailed factual recital, is redacted for publication purposes as unnecessary for understanding the preemption principles here implicated. R. 1:36-3.]
Judge Sciuto heard oral arguments on the summary judgment cross motions on February 6, 1998. At argument the railroad's attorney claimed the maintenance facility located in the Village "is not a maintenance yard in the truest sense" but that it is "just a refueling stop." He explained that long-range trains, destined for the Village and ultimately the Little Ferry Yard, coming from the west coast carry containers shipped from the Orient. These one-to-two-mile-long trains destined for the Village do not arrive at any scheduled time. Defendant's attorney said there was no way of predicting when the trains arrive and that they could arrive during the early hours of the morning. The containers remain under U.S. Custom seal until they arrive at the railroad facility. He said Custom's officers break the containers' seals at the Village facility. He said the railroad also refuels and reoils these long-range trains at the facility located in the Village. He said the railroad facility "services the four or five locomotives it takes to pull a train [one to two-miles] long."
Judge Sciuto relied on a Georgia Federal District Court case, Norfolk Southern Railway Co. & Central of Ga RR Co. v. City of Austell, Docket No. 1:97-cv-1018-RLV (N.D.Ga., August 19, 1997), (not otherwise officially reported) in determining the ICC Termination Act of 1995, 49 U.S.C.A. §§ 701-727; §§ 10101-16105, absolutely preempted the Village's police powers in the circumstance. He quoted the Austell federal judge's statement that the Act "was passed in an effort to reduce regulation of railroads and other modes of surface transportation." Judge Sciuto concluded that the railroad's activities in the Village including fueling, oiling and sanding the trains promotes its overall railroad operation. He agreed with the Austell holding that the remedies provided under the ICC Termination Act demonstrated Congress' intention to preempt state regulatory authority over railroad operations. The judge found the railroad's operations were within the exclusive jurisdiction of the Surface Transportation Board.
Regarding the noise and pollution nuisance issues, Judge Sciuto said plaintiff should seek redress from the "Surface Transportation Board or other federal agency which regulates air emissions or oil pollution emissions," not from the court. Regarding the engine-house contract issue, the judge found there was no meeting of the minds, and if discussion about a contract was made in an effort to settle a dispute, any evidence of a concession would be excluded by N.J.R.E. 408 regarding settlements or proposals of settlements.

V
The Interstate Commerce Commission Termination Act of 1995 (ICC Termination Act or Act) replaced the Interstate Commerce Commission with the Surface Transportation Board (Board or STB). 49 U.S.C.A. § 701. The ICC Termination Act became effective January 1, 1996. Pub.L. No. 104-88 (1995) (codified at 49 U.S.C.A. §§ 701 to 727 and 49 U.S.C.A. §§ 10101 to 16105). The Board has exclusive jurisdiction over transportation by rail carrier which is "only by railroad." 49 U.S.C.A. 10501(a) and (b). The Act's preemption clause is broad: "The jurisdiction of the Board over ... the construction, acquisition, operation ... of ... facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State Law." 49 U.S.C.A. § 10501(b)(2).
The Village argues the ICC Termination Act does not completely preempt the police powers of the State of New Jersey and its municipalities. The Village argues preemption by federal law is not favored in areas where state police power has routinely been exercised unless the legislation clearly displaces the state police power. The Village *272 asserts that because the ICC Termination Act does not explicitly bar all state action, its police powers are still extant. Plaintiff also argues that the judge erred in dismissing its nuisance claim because the ICC Termination Act does not preempt state action designed to protect public health and safety.
The railroad asserts the ICC Termination Act "preempts local regulations that conflict with or frustrate Congress' delegation of regulatory authority to the [Surface Transportation Board], which, within its scope, is exclusive." The railroad also argues plaintiff's nuisance claim was properly preempted.
A defendant relying on an affirmative defense has the burden of persuasion by a preponderance of the evidence standard. Rendine v. Pantzer, 276 N.J.Super. 398, 435, 648 A.2d 223 (App.Div.1994), aff'd 141 N.J. 292, 661 A.2d 1202 (1995); Pagano v. United Jersey Bank, 276 N.J.Super. 489, 500, 648 A.2d 269 (App.Div.1994), aff'd 143 N.J. 220, 670 A.2d 509 (1996). The railroad raises preemption as an affirmative defense and has the burden of persuasion to demonstrate the Village's claims are indeed preempted. R. 4:5-4; Pressler, Current N.J. Rules, Comment R. 4:5-4 [13Arailroads]. See also Maher v. New Jersey Transit R.O., 125 N.J. 455, 463, 593 A.2d 750 (1991).
The Tenth Amendment to the United States Constitution declares "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states respectively, or to the people." U.S. Const. amend. X. The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution. Fidelity Federal Sav. & Loan Assn. v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). The Supremacy Clause states, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land...." U.S. Const. art VI, cl. 2. In conducting a preemption analysis, the "domain expressly preempted" by the statutory language must be identified, keeping in mind two considerations. Medtronic, Inc. v. Lohr, 518 U.S. 470, 484-85, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). First, courts should "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 545-46, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Second, "any understanding of the scope of a pre-emption statute must rest primarily on `a fair understanding of congressional purpose.'" Id. at 485-86, 116 S.Ct. 2240 (citing Cipollone v. Liggett Group, Inc., 505 U.S. at 530, n. 27, 112 S.Ct. 2608)(opinion of Justice Stevens)). The overriding principle in a preemption analysis is whether Congress intended to preempt state law and power. Medtronic, Inc. v. Lohr, 518 U.S. at 494, 116 S.Ct. 2240; Cipollone v. Liggett Group, Inc., 505 U.S. at 516, 112 S.Ct. 2608; Strasenburgh v. Straubmuller, 146 N.J. 527, 539, 683 A.2d 818 (1996).
Congress' intent is "primarily discerned from the language of the pre-emption statute and the statutory framework surrounding it." Medtronic, Inc. v. Lohr, 518 U.S. at 486, 116 S.Ct. 2240. "The clearest indication of [the Legislature's intent] is the statutory language." Medical Soc. of N.J. v. N.J. Dept. of Law & Public Safety, 120 N.J. 18, 26, 575 A.2d 1348 (1990). A court should "look first to the statute's plain language to derive its meaning, absent any specific indication of legislative intent to the contrary." Town of Morristown v. Woman's Club, 124 N.J. 605, 610, 592 A.2d 216 (1991). "Where a statute is clear and unambiguous, a court may not impose an interpretation other than the statute's ordinary meaning." Munoz v. New Jersey Auto. Full Ins. Underwriting, 145 N.J. 377, 384, 678 A.2d 1051 (1996). The legislative history and the announced policy surrounding the statute may also be relevant to determine whether Congress intended the statute to preempt State law. Medtronic, Inc. v. Lohr, 518 U.S. at 494, 116 S.Ct. 2240. "Pre-emption may be either express or implied and is `compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" Fidelity Federal S. & L. Assn. v. de la Cuesta, 458 U.S. at 153, 102 S.Ct. 3014 (citing Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 *273 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). State law which conflicts with federal law is without effect. Cipollone, 505 U.S. at 504, 112 S.Ct. 2608 (citing U.S.C.A. Const. art. 6, cl. 2). "Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." Fidelity Federal S. & L. Assn. v. de la Cuesta, 458 U.S. at 153, 102 S.Ct. 3014. "In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law." Cipollone, 505 U.S. at 516, 112 S.Ct. 2608.
Any preemption analysis must focus on the assumption that state police powers are not preempted unless this was the clear purpose of Congress. Medtronic, Inc. v. Lohr, 518 U.S. at 484-85, 116 S.Ct. 2240. Determining Congress' intent must start with analyzing the statutory language of the preemption statute. Id. at 486, 116 S.Ct. 2240. The pertinent statute here states the Surface Transportation Board has jurisdiction "over transportation by rail carrier that is (a) only by railroad...." 49 U.S.C.A. § 10501(a)(1)(A). The Board has exclusive jurisdiction over,
(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

[49 U.S.C.A. § 10501(b)(1) and (2).]
The Act defines transportation as,
(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
(B) services related to that movement ...

[49 U.S.C.A. § 10102(9)(A) and (B).]
The Act's definition of railroad includes,
a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation.

[49 U.S.C.A. § 10102(6)(C).]
The Act defines rail carrier as,
a person providing common carrier railroad transportation for compensation ...

[49 U.S.C.A. § 10102(5).]
The language of the statute does not expressly limit preemption to strictly "economic regulation" nor does it state that the states retain historic police powers over railroads and their property. We are told, pursuant to the clear language of the statute, that the "construction" and "operation" of the railroad's "facilities" falls within the Board's express and exclusive jurisdiction. 49 U.S.C.A. § 10501(b)(1) and (2). By definition, a railroad's "facility," "warehouse," "yard," "property," "instrumentality," and "equipment of any kind related to the movement of passengers or property," "regardless of ownership or an agreement concerning use" are all within the scope of the Act's concept of "transportation." 49 U.S.C.A. § 10102(9)(A). Thus, pursuant to the statutory language, the Board appears to have exclusive jurisdiction over everything pertaining to the railroad's facility in the Village mentioned in the Act's definition of transportation, i.e., the tracks and sidetracks, the sand tower, the lube oil and diesel fueling facilities and tanks, the converted box cars, the yard bulls, the proposed engine house, and so on.
The legislative history and policy surrounding the statute may also be considered in determining the scope of a statute's preemption. Medtronic, Inc. v. Lohr, 518 U.S. at 494, 116 S.Ct. 2240. The section-by-section analysis portion of the congressional "history" to the ICC Termination Act, entitled Section. 10301. General Jurisdiction, for example, states,
This provision replaces the railroad portion of former Section 10501. Conforming *274 changes are made to reflect the direct and complete pre-emption of State economic regulation of railroads.... The former disclaimer regarding residual State police powers is eliminated as unnecessary, in view of the Federal policy of occupying the entire field of economic regulation of the interstate rail transportation. Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.

[H.R. Conf. Rep. No. 104-422, Dec. 18, 1995; (emphasis supplied).]
When the Act was adopted, Congress retained the section entitled general jurisdiction, delineated as § 10501. However, the Congressional intent stated above with regard to the proposed § 10301 readily applies to § 10501. Both sections cover the same topic, general jurisdiction. The only distinction is the section number assigned. From the language in this legislative history, Congress surely intended the Act to preempt all State economic regulation of railroads. But it is also apparent from the noted history that Congress intended the states retain certain police powers reserved by the Constitution. We conclude that all state action with any economic impact on railroads was preempted by the Act and that the states retained a certain residuum of historic police powers, but presumably those not related to railroad service, operations and physical properties or structures.
A review of the "Rail Transportation Policy" section of the Act reveals the Act's focus is on the deregulation of many aspects of the interstate railroad system, not only on strictly economic aspects. For example, one policy stated is to "reduce regulatory barriers to entry into and exit from the industry." 49 U.S.C.A. § 10101(7). Another policy is to "minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required." 49 U.S.C.A. § 10101(2). Another policy is to increase "competition and demand for services." 49 U.S.C.A. § 10101(1). The "Policy" section also states that "it is the policy of the United States Government ... (8) to operate transportation facilities and equipment without detriment to the public health and safety." 49 U.S.C.A. § 10101(8). The policy section also states that safety, safe and suitable working conditions, unlawful discrimination, anti-trust violations, and energy conservation are policy considerations. Id. at (3), (11), (12) and (14). However, the dominant public policy emphasis is on a very substantial overall deregulation of the railroad industry. As aptly stated in CSX Transportation, Inc. v. Georgia Public Service Commission, 944 F.Supp. 1573, 1583 (N.D.Ga.1996), "[b]y preempting state regulation of railroad operations, and granting exclusive jurisdiction over the regulation of almost all aspects of railroad operations to the [Board], Congress removes the ability of states to frustrate its policy of deregulating and reviving the railroad industry." The Act obviously intended that national transportation interests dominate over parochial concerns and impulses.
A few courts in the land have addressed the issue of preemption under the ICC Termination Act of 1995. In 1996 the Nebraska Supreme Court held it lacked subject matter jurisdiction to determine whether Burlington Northern Railroad Company's application to "discontinue its `Osmond Direct Service Agency' and transfer that agency's services to Burlington's Lincoln agency" was properly granted by Nebraska's Public Service Commission. In re Application of Burlington Northern Railroad, 249 Neb. 821, 545 N.W.2d 749 (1996). The Nebraska Supreme Court held it lacked "jurisdiction to address the matter because the ICC Termination Act of 1995 preempts state remedies and vests exclusive jurisdiction in the federal government for interstate rail matters affecting practices, routes, services, and facilities of rail carriers." Id. 545 N.W.2d at 750. The court found that 49 U.S.C.A. § 10501(a) of the ICC Termination Act granted exclusive jurisdiction over transportation by rail carriers in the Surface Transportation Board and that state courts could no longer consider the "practices, routes, services, and facilities of interstate rail carriers...." Id. 545 N.W.2d at 751.
*275 In 1996, a Georgia federal district court addressed whether the ICC Termination Act of 1995 preempted the Georgia Public Service Commission's "authority to regulate railroad agency closings in Georgia." CSX Transportation, Inc. v. Georgia Public Service Commission, 944 F.Supp. at 1573. Georgia's Public Service Commission had regulated its state's railroads since 1897. Plaintiffs CSX and Norfolk maintained railroad agency offices in Georgia which were responsible for ticket sales, baggage handling, and customer information. The Georgia Public Service Commission denied CSX's requests for permission to modify their agency offices or discontinue them. Id. at 1575. The federal court determined the language contained in 49 U.S.C.A. § 10501(b)(2) was an "express preemption clause" and clearly showed Congress' "intent to preempt state regulatory authority over railroad operations." Id. at 1581. The pertinent part of the statute relied upon by that court states, "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C.A. § 10501(b)(2). The court said regulating the closing of railroad agencies came within "regulation of rail transportation." CSX Transportation, Inc. v. Georgia Public Service Commission, 944 F.Supp. at 1581. The court also stated, "[t]he Act was passed in an effort to reduce the regulation of railroads and other modes of surface transportation." Id. at 1576 (citing 49 U.S.C.A. § 10101).
In 1997, a federal district court in Montana ruled the ICC Termination Act preempted economic regulation of rail transportation and expressly preempted Montana state law regarding discontinuance of railroad station agencies. Burlington Northern Santa Fe Corporation v. Anderson, 959 F.Supp. 1288 (D.Mont.1997). The court also agreed with the reasoning in CSX Transportation, Inc. v. Georgia Public Service Commission, 944 F.Supp. at 1573. The Montana federal court, relying on 49 U.S.C.A. § 10501(b)(2) stated the Act "reserves no area of regulation for the individual states agency regulation or otherwise." Burlington Northern, 959 F.Supp. at 1295. That court stated the Act preempted "economic regulation" and that "[t]he statutory language and accompanying legislative record evidence Congress' clear and manifest intent to occupy the entire field of economic regulation of rail transportation...." Id. at 1296. In Rushing v. Kansas City Southern Railway Company, 14 F.Supp.2d 869 (S.D.Miss.1998), the federal district judge declined on federal preemption grounds to grant relief by injunction against common-law nuisance claim based on coupling and whistle noise and engine traffic vibration. See Georgia Public Service Commission v. CSX Transportation, Inc., 225 Ga.App. 787, 484 S.E.2d 799 (1997) (ICCTA preempted state public service commission's ruling on staffing of service facility).
In October 1998 the Ninth Circuit addressed the preemption issue in City of Auburn v. U.S. Government, 154 F.3d 1025 (9th Cir.1998) (the "Stampede Pass" case). The Ninth Circuit held the ICC Termination Act specifically preempts state and local environmental and land use permitting laws regarding railroad operations because of the plain language of the Act and the statutory structure. Id. at 1031. In the "Stampede Pass" case the Ninth Circuit echoed the Georgia federal district court's conclusion on the breadth of the Act's preemption clause, stating:
The preemptive effect of the ICCTA, which went into effect January 1, 1996, is a question of first impression on the appellate level of this circuit. The district courts which have had the opportunity to examine this question have applied federal preemption. Despite the petitioner's claims to the contrary, the reasoning of these courts support preemption in this case as well.
In CSX Transp., Inc. v. Georgia Public Service Comm'n, 944 F.Supp. 1573 (N.D.Ga.1996), the district court found § 10501(b)(2)'s preemption of state regulation of railroad agency closings by stating: "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." 944 F.Supp. at 1581. "Interpreting the preemption clause in the ICC Termination *276 Act to be broad enough to preempt state regulation of agency closings," the court stated, "is consistent with the Act's grant of exclusive jurisdiction over almost all matters of rail regulation to the STB."

[Id. at 1029-30.]
The Ninth Circuit responded to the City of Auburn's claim in the "Stampede Pass" case that ICCTA did not attempt to preempt local environmental regulation by stating:
Auburn attempts to distinguish its permitting requirements as environmental rather than economic regulation, claiming this is a "traditional state police power" that Congress did not intend to preempt. It correctly points out that courts have declined to preempt state environmental regulation in some other contexts. See, e.g., Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483, 501 (9th Cir.1984). However, the pivotal question is not the nature of the state regulation, but the language and congressional intent of the specific federal statute. See, e.g., Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (Preemption of state law is compelled if Congress' command is explicitly stated in the federal statute's language or implicitly contained in its structure or purpose.)
For example, in Hammond, the court allowed an Alaska statute governing the discharge of ballast by oil tankers after finding that in the Clean Water Act, Congress "clearly expressed its intent to allow the states to take an active role in abating water pollution." 726 F.2d at 489. In contrast, there is no evidence that Congress intended any such state role under the ICCTA to regulate the railroads.
Additionally, given the broad language of § 10501(b)(2), (granting the STB exclusive jurisdiction over construction, acquisition, operation, abandonment, or discontinuance of rail lines) the distinction between "economic" and "environmental" regulation begins to blur. For if local authorities have the ability to impose "environmental" permitting regulations on the railroad, such power will in fact amount to "economic regulation" if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line.

We believe the congressional intent to preempt this kind of state and local regulation of rail lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Because congressional intent is clear, and the preemption of rail activity is a valid exercise of congressional power under the Commerce Clause, we affirm the STB's finding of federal preemption.

[Id. at 1024-25; emphasis supplied.]
We also point out that in the "Stampede Pass" case the STB, when requested, quickly granted an administrative audience and rendered a prompt decision on the environmental health and safety claims of the county and local government bodies allegedly affected by the opening of the new service. Id. at 1027. The Ninth Circuit found that the agency had promptly and fully considered the environmental consequences of "concerns such as rail traffic increases, transportation safety, energy, air quality, and noise." Id. at 1032.
This fortifies our conclusion that the concerns raised by the Village here are a matter at least for the primary jurisdiction of the responsible agency, the STB, if not ultimately one of total federal preemption. We contrast this situation with the Ninth Circuit's recent ruling allowing that common-law "run-of-the-mill personal injury claims" for money damages arising from airline travel is not inconsistent with the preemption features of the Airline Deregulation Act, 49 U.S.C.A.App. § 1305(a)(1), Charas v. Trans World Airlines, 160 F.3d 1259 (9th Cir.1998). Allowing money judgments against the railroad for carelessly injuring people does not affect the operation or interrupt the service of the railroad, although it may incidentally raise insurance rates or overall business expenses.
We conclude that the plaintiff must submit its claim to the STB for resolution. This *277 action is essentially for injunctive relief. As noted, the Village includes a claim for money damages but does not itself assert any specific damage to municipal property from defendant's operation. We doubt any occurred. Thus, in the present posture of this case, a court could not award money damages for tortious conduct. The claim is and remains a claim for injunctive relief against a public nuisance created by the defendant's railroad operations. To afford plaintiff injunctive relief we would have to hold that the Law Division could, if it agrees with plaintiff's claim of public nuisance, order that defendant (1) submit to standard municipal inspections and remove certain facilities or cease using them if they do not comply with applicable local standards (the sand tower; the converted box cars used as administrative facilities; the tank-cars and lube oil vessel used for refueling and servicing, or the recently erected fuel tank) and (2) cease or diminish its annoying operations, allowing multiple engines perhaps a dozen or more (and cars) to stand and idle in the Village at night or at anytime the number of engines is substantial, creating soot, tremors and unseemly noise.
We conclude that if the Law Division judge had the type of control over defendant's operation to order this relief, he would be invading the preempted area of exclusive federal regulation. Further, if the judge ordered local inspections concerning sanitary and sewer facilities, building and safety codes, and land-use permitting process, he would be condoning, if not ordering, regulation of defendant's railroad facilities in violation of the overarching federal legislative scheme.
We are most reluctant to remand for a plenary hearing to consider injunctive relief in a situation where we cannot tell the remand court the scope of the adjudicative powers which it may use to enforce plaintiff's claims. We are constrained to conclude that plaintiff must present its claim to the STB in the first instance under the doctrines of federal preemption and primary jurisdiction.[1] *278 "As the agency with authority delegated from Congress to implement the provisions of the ICC Termination Act, the STB is uniquely qualified to determine whether state law should be preempted." CSX Transportation, Inc. v. Georgia Public Service Commission, 944 F.Supp. at 1584 (quoting Medtronic, 518 U.S. at 496, 116 S.Ct. 2240.) The STB may act on the problem and devise a plan which gives these troubled citizens a measure of relief. We cannot presume and have no reason to believe that the STB will ignore legitimate citizen complaints. The STB may also choose to spell out the precise contours of the residual state police powers which it finds survive the broadly-phrased federal preemption statute and are compatible with the national policy of railroad deregulation and federal primacy. If so, this present action will be promptly reinstated at the trial level upon plaintiff's application and given every priority towards an expedited resolution. Finally, if the STB declines to consider these complaints on the merits, we will construe this as a signal that there is no federal preemption in the circumstances, giving the state court the right on appropriate and timely application to resurrect this action and to proceed on the merits of the public nuisance claims. The site cannot forever remain a regulatory "no-man's land."

VI
Finally, we affirm the judge's dismissal of the contract claim for several reasons. In view of our finding on federal preemption, plaintiff can obviously not obtain an enforceable court order to compel the railroad to build the engine house, as once proposed by defendant. Indeed, based on this record we cannot envision how construction of the engine house as proposed would alleviate any of the myriad problems plaintiff describes.
We are also convinced that the basic elements of an enforceable contracta meeting of the minds and adequate consideration8 are not here present. Any forbearance for a few months on this lawsuit is probably illusory consideration in this context. See I Farnsworth, Contracts § 2.19 at 134 (1990). From this record, it is obvious the parties never formally agreed upon anything. No municipal resolutions or any other writings describe the alleged agreement. Throughout the 1990's the railroad avoided doing anything about the complaints of the Village (except to install the fuel tank required by EPA); the Village in turn tried to move the railroad's activities on the right-of-way out-of-town. The concept of a "meeting of the minds" is virtually chimerical in the circumstance. We also conclude that because plaintiff did not plead a claim under the Oil Pollution Act, 33 U.S.C.A. § 2702, the motion judge properly eschewed consideration of that assertion in his decision.
Affirmed, as modified.
NOTES
[1] See Gellhorn & Levin, Administrative Law and Process in a Nutshell at 383-86 (West 1997) where the authors state:

E. PRIMARY JURISDICTION
Unlike the preceding topics examined in this chapter, the doctrine of primary jurisdiction is not a defense to judicial review of agency action. Indeed, it comes into play only in cases that fall within the original jurisdiction of the courts. However, it is often discussed in conjunction with exhaustion and ripeness because, like those doctrines, it is a tool by which courts seek to avoid interfering with an agency's ability to carry out its statutory functions in a coherent way. Briefly, primary jurisdiction questions arise when a court hearing a civil or criminal case encounters an issue that also falls within the distinctive competence of an administrative agency. If the court chooses to invoke the doctrine, it will suspend consideration of the disputed issue and direct the parties to take the matter to the agency for an initial determination. Thus, the primary jurisdiction doctrine is somewhat analogous to the federal courts' practice of abstaining from deciding an issue of state law so that state courts may address the issue.
There are two principal reasons for requiring a private litigant to resort to the administrative process before pursuing court litigation. First, a referral to the agency may preserve needed uniformity in a regulatory program. Thus, in Texas & Pac. R.R. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), a shipper sued the railroad in state court, alleging that the railroad's rates, which had been approved by the Interstate Commerce Commission, were unreasonably high. The Court held that this question was within the primary jurisdiction of the ICC, because a major objective of the Interstate Commerce Act had been to achieve national uniformity of rates, and this goal would be frustrated if numerous courts across the country could enforce ad hoc judgments as to whether individual rates were excessive. Second, the litigation may involve issues that go beyond the conventional experience of judges, and on which the expertise of the agency could be helpful. In United States v. Western Pacific R.R., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), a railroad shipped napalm in steel casings for the Army, charging its established rate for "incendiary bombs." The Army claimed that the (lower) rate for "gasoline in steel drums" applied, and the railroad sued for payment in the Court of Claims. On appeal, the Supreme Court again referred the question to the ICC: since that agency had approved the tariffs in which the two rates appeared, it was in the best position to know whether the purposes underlying the high rate for "incendiary bombs" were implicated in this situation.
[Id. at 383-84].
* * * * *
As these cases suggest, the basic justification for the doctrine of primary jurisdiction is to coordinate the work of agencies and courts. Their activities are most likely to come into conflict where the agency's regulation is pervasive, and where uniform interpretations are necessary to assure effective regulation. Therefore, the doctrine is most likely to be applied in cases concerning the intensively regulated industrieswhere agencies control entry, price, and nature and quality of service than in cases concerning industries that are subject to less extensive controls. In the end, however, invocation of the doctrine is highly discretionary and seems to depend on whether the court actually feels out of its depth as it confronts the issues raised by the parties.
[Id. at 385-86.]
For several recent examples of primary jurisdiction see MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1102-03 (3d Cir. 1995) (Third Circuit deferred to Pennsylvania state public utility commission); Boss v. Rockland Electric Co., 95 N.J. 33, 40, 468 A.2d 1055 (1983) (Court deferred to PUC).