BAR TECHNOLOGIES INC., Plaintiff,

v.

CONEMAUGH & BLACK LICK
R.R. CO., Defendant.

·Civil Action No. 99–41J.

United States District Court,
W.D. Pennsylvania.

Nov. 9, 1999.

Ralph A. Finizio, Houston Harbaugh, Pittsburgh, PA, Michele Ann Smolin, R. Jeffery Pollock, McDonald, Hopkins,

Burke & Haber, Cleveland, OH, for Plaintiff.

Sheila Smith DiNardo, Buchanan Ingersoll, Pittsburgh, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

### D. BROOKS SMITH, District Judge.

In this case, plaintiff, Bar Technologies, Inc. ("BarTech"), claims that the alleged refusal of defendant, Conemaugh & Black Lick Railroad Company ("C & BL"), to allow the proposed rail line of plaintiff to cross its existing line at grade, despite an easement requiring the C & BL to permit grade crossings, violates antitrust law. Defendant has filed a motion to dismiss, dkt. no. 5, which argues on the merits that BarTech has stated no valid claims, and also strenuously asserts that the issues presented in plaintiff's complaint are committed to the exclusive primary jurisdiction of the Surface Transportation Board ("STB") incident to its plenary power to regulate the construction, operation and abandonment of rail lines. For the following reasons, I will grant the motion.

### I.

Stated in the light most favorable to plaintiff, the complaint reveals that BarTech is a manufacturer of "bar quality hot rolled steel" which it produces in a Johnstown, Pennsylvania factory it acquired from Bethlehem Steel in 1994. The C & BL, a wholly owned subsidiary of Bethlehem, provides the only rail link between the BarTech plant, on which it operates upon an easement, and the interstate rail transportation network. Believing that it could provide this link more cost-effectively than can the C & BL with its filed tariffs, BarTech sought to construct its own private rail line to the main line tracks. This, however, required BarTech's proposed trackage to cross the C & BL tracks at grade. BarTech was permitted to do this pursuant to its reserved rights in the C & BL easement, but the C & BL nevertheless refused its permission, citing operational and safety concerns.[1] To BarTech, however, this refusal was a naked attempt to restrain competition and force it to accept the C & BL's monopolistic tariff rates.

Accordingly, BarTech filed the instant suit, alleging in four counts that C & BL violated section 2 of the Sherman Anti-Trust Act, breached its contract with BarTech and interfered with BarTech's "servient owner rights." BarTech seeks both compensatory and treble damages, as well as declaratory and injunctive relief. Defendant has filed a motion to dismiss, which is now fully briefed and ready for disposition.

### II.

A motion to dismiss cannot be granted unless the allegations in the complaint taken as true fail to state any claim upon which relief can be granted. *Angelastro v. Prudential–Bache Securities, Inc.*, 764 F.2d 939, 944 (3d Cir.1985) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In ruling upon a motion to dismiss, a district court must accept as true all facts alleged in the complaint, and view them in the light most favorable to the plaintiff. *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990). A court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir.1997) (quoting *Glassman v. Computer-*

---

1. A crossing at grade is not unlike a common intersection of two streets, except that the inherent limitations of track and rolling stock preclude turns and other maneuvers. If a BarTech train is using the grade crossing, C & BL's trains will be blocked from doing so until the BarTech train safely exits the crossing. Moreover, it is possible for one train to have a side-on collision with another railroad's train that happens to be in the crossing. Thus, the safety and operational concerns are not without basis. Nevertheless, grade crossings have been common in the railroad industry, probably from its earliest days.

*vision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996)).

### III.

Defendant spends the bulk of its brief on its argument that the entire case must be dismissed for lack of subject matter jurisdiction. It asserts, first, that the construction and operation of rail lines and grade crossings is committed to the exclusive primary jurisdiction of the STB. Because BarTech never sought STB approval to build its rail line and grade crossing, defendant contends essentially that Bar-Tech's problems are solely of its own making and that any damages it suffered are not the C & BL's fault. Alternatively, defendant argues that even if BarTech had sought regulatory approval, the question of whether it can build its rail line and grade crossing can and must be decided only by the STB.

Defendant relies on 49 U.S.C. § 10901(a), which provides that:

A person may-

(1) construct an extension to any of its railroad lines;

(2) construct an additional railroad line;

(3) provide transportation over, or by means of, an extended or additional railroad line; or

(4) in the case of a person other than a rail carrier, acquire a railroad line or acquire or operate an extended or additional railroad line, only if the Board issues a certificate authorizing such activity under subsection (c).

It also relies on subsection (d)(1), which recites:

When a certificate has been issued by the Board under this section authorizing the construction or extension of a railroad line, no other rail carrier may block any construction or extension authorized by such certificate by refusing to permit the carrier to cross its property if-

(A) the construction does not unreasonably interfere with the operation of the crossed line;

(B) the operation does not materially interfere with the operation of the crossed line; and

(C) the owner of the crossing line compensates the owner of the crossed line.

Based on this statutory text, defendant argues that BarTech was and is forbidden from building either its rail line or crossing without STB approval. This contention, while initially plausible, is incomplete in its consideration and analysis of the statute.

Section 10501 sets forth a grant of general jurisdiction to the STB. Subsection (a)(1) provides that "the Board has jurisdiction over transportation *by rail carrier* that is ... by railroad." (Emphasis added.) Subsection (a)(2) then limits that jurisdiction to, for present purposes, transportation over the interstate rail network. Subsection (b) then provides that:

The jurisdiction of the Board over-

(1) transportation *by rail carriers* ...; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (emphasis added).

■ Taken together, the exclusivity granted in subsection (b)-which would appear to encompass the "industrial" or "spur" track BarTech wishes to construct-must be read as subject to the limits of the general jurisdiction granted in subsection (a)(1). This means that the STB's jurisdiction over the construction of spur or industrial track is exclusive only to the extent the Board has jurisdiction at all, that is, to the extent that the proposed tracks implicate "transportation *by rail carrier* that is

... by railroad." 49 U.S.C. § 10501(a)(1)(emphasis added).

Section 10102(5) defines a "rail carrier" as "a person providing common carrier railroad transportation for compensation." Both judicial decisions and administrative adjudications have further defined a "common carrier" "as an entity that offers its services for compensation to all members of the public that are in a position to use them." *Chicago Terminal Corp.*, ICC Finance Docket No. 32495, 1994 WL 732863, p. 6 (ICC, served Jan. 12, 1995) (citing agency decisions); *see Lone Star Steel Co. v. McGee*, 380 F.2d 640, 643 (5th Cir.1967) (FELA case) (quoting *Kelly v. General Elec. Co.*, 110 F.Supp. 4, 6 (E.D.Pa.) (FELA), *aff'd as circuit precedent*, 204 F.2d 692 (3d Cir.1953) (per curiam)); *Duffy v. Armco Steel Corp.*, 225 F.Supp. 737, 738 (W.D.Pa.1964) (Willson, J.). Mere construction of track by a company on its own property does not, without more, turn that company into a common carrier. *Ciaccio v. New Orleans Public Belt R.R.*, 285 F.Supp. 373, 375 (E.D.La.1968) (FELA, discussing *Kelly* ). As the *Kelly* court put it:

> A common carrier has been defined generally as one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant. The dominant and controlling factor in determining the status of one as a common carrier is his public profession as to the service offered or performed.

110 F.Supp. at 6 (citation omitted).

Here, BarTech has no intention of operating its rail line as a common carrier for hire to shippers, but seeks only a means of transporting its own carloads of steel from its Johnstown plant onto the interstate rail network. As such, it is not a rail carrier and the jurisdictional prerequisite of § 10501(a)(1) is not satisfied. That being the case, the Board simply has no jurisdiction under § 10901(a) to either approve or disapprove BarTech's proposed construction of its rail line.

This construction is consistent with the former ICC's interpretation of the statute, before its amendment by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), Pub.L. 108–88, 109 Stat. 807. In its *Chicago Terminal* opinion issued less than a year before the enactment of the ICCTA, the Commission held:

> The Commission may approve or exempt only a transaction that is within its jurisdiction.... The Commission's jurisdiction over railroads is limited to common carriers.

1994 WL 732863 at p. 3; *accord Hanson Natural Resources Co.*, ICC Finance Docket No. 32248, 1994 WL 673712 (ICC, served Dec. 5, 1994); *Northern Plains R.R. Co.*, ICC Finance Docket No. 32077, 1992 WL 383329 (ICC, served Dec. 28, 1992); *State of Maine*, 8 I.C.C.2d 835, 836–37, 1991 WL 84430 (ICC 1991).

Defendant cites two cases purportedly to the contrary, but both are inapposite. In *CSX Transp., Inc. v. Georgia Pub. Serv. Comm.*, 944 F.Supp. 1573 (N.D.Ga.1996), the issue was not whether the STB could regulate the construction of private industrial track, but "whether the ICC Termination Act of 1995 preempt[ed the state's] authority to regulate railroad agency closings in Georgia." *Id.* at 1580. In that case, the railroad-one of the nation's largest—was clearly a common carrier. To the same effect is *Village of Ridgefield Pk. v. New York, S. & W. Ry. Corp.*, 318 N.J.Super. 385, 724 A.2d 267, 277, *cert. granted*, 160 N.J. 476, 734 A.2d 791 (1999), in which the question was whether local authorities could exercise general police powers to abate an alleged public nuisance arising from the operation of a locomotive refueling facility. In both cases, preemption was found, but as both railroads were common carriers, neither case provides support for defendant's argument.

Even if § 10501 did grant jurisdiction to the STB over a non-rail carrier like BarTech, § 10901 would still be unavailing to the C & BL's position. Section 10906, formerly codified as § 10907(b)(1), states:

> The Board does not have authority under this chapter[2] over construction, acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or side tracks.

Under this section, the STB simply has no jurisdiction over BarTech's industrial track. *Cf. Hughes v. Consol–Pa. Coal Co.*, 945 F.2d 594, 612 (3d Cir.1991) (no jurisdiction over railroad-operated spur track connecting main railroad line only with a single company's coal mine).

Defendant places great reliance on the language of § 10901 itself, correctly pointing out that nothing in the express language of that section limits its applicability to common carriers. Indeed, the prior version of that section referred specifically to "rail carriers" as the only parties which needed ICC approval to construct a rail line, while the present version refers instead to "persons." Dkt. no. 11, at 4. Defendant also cites to the administrative regulations promulgated under § 10901 in support of this argument. Specifically, it focuses upon 49 C.F.R. § 1150.1(a), which states that "[n]oncarriers require Board approval to construct, acquire or operate a rail line in interstate commerce." From this, and one ICC administrative decision, *Kansas City S. Ry. Co., ICC Finance Docket No. 32547*, 1995 WL 348732 (ICC, served June 2, 1995), it claims that "[t]he Act includes no exemption for construction of a rail line on one's own property." Dkt. no. 11, at 5. Although defendant's argument may well hold true under different circumstances, it must fail under the facts of the case *sub judice.*

First, the legislative history of the ICC-TA states explicitly that, as to § 10901, no change was intended vis-a-vis existing law, and that "non-railroad companies who con-

struct rail lines to serve their own facilities, whether or not such lines would be classified as a spur or other auxiliary track exempt from agency jurisdiction [under § 10906], are not required to obtain agency approval to engage in such construction." H.R. Conf. Rep. No. 311, 104th Cong, 1st Sess. 179, *reprinted in* 1995 U.S.C.C.A.N. 793, 864. Indeed, the change from "rail carrier" to "person" must have been intended to correct the ambiguity concerning whether a non-carrier who acquires an active common carrier rail line is subject to STB jurisdiction. Many courts answered that question in the affirmative, *see United Transp. Union-Illinois v. ICC*, 52 F.3d 1074, 1078 (D.C.Cir.1995), and the amended statute, by referring to "persons" in § 10901(a) and "person other than a rail carrier" in § 10901(a)(4), merely codifies that result by requiring such a person to seek Board approval. This is also the obvious import of 49 C.F.R. § 1150.1(a), cited by defendant and quoted *supra.* Accordingly, I conclude that neither the 1995 amendment nor the administrative regulation confers Board jurisdiction over BarTech.

As for *Kansas City Southern*, it is simply inapposite to this proceeding. There, a railroad wished to construct what it considered to be an exempt spur track on its own property to serve an Exxon plastics plant that was already served by another railroad, and the Board held that the proposed track was an extension of its common carrier line, not a spur. 1995 WL 348732. Nowhere in that opinion did the Board hold that a *customer's* proposed construction of an industrial track to a common carrier rail line was within its jurisdiction.

Accordingly, I conclude that the STB has no jurisdiction over whether BarTech can construct its industrial track. That leaves defendant's related argument, which contends that STB approval is re-

---

**2.** "[T]his chapter[,]" as used in § 10906, refers to chapter 109 of the statute, which includes §§ 10901–10907.

quired before BarTech can build a grade crossing over the C & BL line, regardless of whether BarTech can simply construct track *vel non.*

Defendant relies exclusively upon 49 U.S.C. § 10901(d)(1), which states (emphasis added):

> When a certificate has been issued by the Board under this section authorizing the construction or extension of a railroad line, no other rail carrier may block any construction or extension authorized by such certificate by refusing to permit the carrier to cross its property if-
>
> > (A) the construction does not unreasonably interfere with the operation of the crossed line;
> >
> > (B) the operation does not materially interfere with the operation of the crossed line; and
> >
> > (C) the owner of the crossing line compensates the owner of the crossed line.

This subsection of § 10901, like subsection (a) discussed *supra,* does not come to the aid of defendant's cause.

I must first note that any reliance on subsection (d)(1) suffers from the same deficiency as that on subsection (a), specifically, that § 10906 removes industrial track from the Board's jurisdiction, as do the common carrier limitations of §§ 10501(a)(1) and 10102(5). Beyond that, the language of subsection (d)(1) does not contain a jurisdictional grant over the construction of crossings, and merely recites the legal duties of the "crossed" railroad once the Board has authorized the construction. Defendant's citation to this subsection, then, merely begs the question of whether that authorization is required in the first instance. For the reasons I have already set forth, no such authorization is needed and subsection (d)(1) is therefore inapposite.[3]

Because the STB has no jurisdiction over either the construction of the proposed BarTech track or the installation of the crossing, I reject defendant's jurisdictional arguments in their entirety and will deny that portion of its motion to dismiss.

## IV.

### A.

Defendant next argues that plaintiff's entire complaint fails because the actions of the C & BL were not the proximate cause of any damages to BarTech. In part, this contention rests on the theory that, because the STB has exclusive jurisdiction to approve BarTech's proposed rail line and BarTech has not even sought such approval, BarTech is not legally entitled to build the line in the first instance. Accordingly, defendant asserts that "[a]ny damages allegedly sustained by BarTech from having to use the C & BL Railroad are the proximate result of BarTech's own conduct, not any conduct of C & BL." Dkt. no. 6, at 11–12. For the reasons already stated, I cannot accept this argument.

### B.

■ The other part of defendant's no-damages argument requires further discussion. Defendant contends that because the C & BL's freight rates are set by tariffs filed with the STB, any "damages" BarTech has or will incur are barred under the filed rate doctrine, under which a court may not grant damages based upon, or otherwise interfere with, a tariff approved by an administrative agency charged with that duty. As defendant puts it, "a court is distinctly unqualified to determine in a highly regulated industry what a reasonable, fair (or in this case, 'competitive') rate might be." *Id.* at 13 (emphasis deleted); *see generally Kentucky W. Va. Gas Co. v. Pennsylvania Pub. Util. Comm.,* 837 F.2d 600, 606 (3d Cir.1988); *Keogh v. Chicago & N.W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Thus, in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409,

---

**3.** This does not render subsection (d)(1) superfluous. In the more typical case, one common carrier railroad will be seeking to cross the line of another. In that scenario, Board approval will be required and subsection (d)(1) will come into play.

106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Supreme Court held that a private antitrust action alleging anticompetitive rate fixing by motor carriers would not lie when those rates took the form of tariffs filed with and approved by the ICC. *Accord Wegoland, Ltd. v. NYNEX Corp.*, 806 F.Supp. 1112, 1113–16, 1125 (S.D.N.Y. 1992), *aff'd*, 27 F.3d 17, 18–22 (2d Cir. 1994).

Here, however, BarTech is not challenging the rates charged by the C & BL for the shipment of steel, at least not directly.[4] It is simply proposing to construct its own rail line, in the hopes of meeting its steel shipping needs more cost-effectively, and the C & BL has blocked those efforts. Put simply, BarTech's attempt to avoid a monopoly price—and the litigation that has resulted from it—does not put this court in the position of second-guessing the tariff rates approved by the STB. As the Third Circuit has stated:

> [The filed rate doctrine] merely prevents private shippers from sustaining an award of treble damages by claiming that ICC-approved rates were the product of an antitrust violation. That ... does not preclude liability based on non-rate anticompetitive activity.... We recognize that the success of anticompetitive non-rate activity would coincidentally implicate rates promulgated under the jurisdiction of the ICC. It is fully consistent with [the filed rate doctrine], however, to accept these rates as lawful and nonetheless to conclude that

4. I am mindful of the possibility that BarTech might not actually intend to construct its proposed rail line, but is using the threat of doing so to induce the C & BL to lower its tariff rates. Whether or not this is a feasible strategy (the C & BL would likely have to change its tariff for all shippers), it still is not the same as one shipper's direct, litigation-based attack on a carrier's rates that could result in price discrimination and implicate the filed rate doctrine.

5. To the extent that defendant's antitrust arguments are meritorious, only the antitrust claim can be dismissed, leaving the pendent state law claims for further adjudication.

through non-rate activities, particularly the ... refusal to deal with potential competitors, the [defendants] effectively retarded entry of lower-cost competitors to the market. The instrument of damage ... was the absence of the lower-cost combination.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1159 (3d Cir.1993). Accordingly, the filed rate doctrine does not apply on the facts of this case.

## C.

■ Defendant's more substantial argument is that "BarTech's antitrust claim should ... be dismissed because it has not ... suffered a cognizable antitrust injury."[5] Dkt. no. 6, at 14. That is, while BarTech may have suffered some injury individually because of the CB & L's refusal to deal on a grade crossing, defendant contends that there was no injury to competition and hence no damage of the type the antitrust laws were designed to protect. After careful consideration, I conclude this assertion has merit.

"Antitrust injury is a necessary ... condition of antitrust standing." *Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir.1997). It has been defined as "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 641 (3d Cir.1996) (citations omitted).[6] As the Third Circuit has said,

6. This standard applies regardless of whether treble damages are sought under section 4 of the Clayton Act, 15 U.S.C. § 15, or injunctive relief is requested under section 16, 15 U.S.C. § 26. *Pennsylvania v. Milk Indus. Mgt. Corp.*, 812 F.Supp. 500, 506 (E.D.Pa.1992); *Remington Prods., Inc. v. North Am. Philips Corp.*, 717 F.Supp. 36, 44–45 (D.Conn.1989) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (sec.16); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (sec.4)), *on reconsideration*, 755 F.Supp. 52, 55 (D.Conn.1991); *Alaska Teamsters Local 959 v. Atlantic Richfield Co.*, 616 F.Supp. 593, 609 (D.Alaska

because antitrust law aims to protect competition, not competitors, a court must analyze the antitrust injury question from the viewpoint of the consumer. An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare.

*Id.* (citations and internal quotation marks omitted). If an antitrust plaintiff is neither a consumer nor a competitor of the defendant in the relevant market, its damages cannot constitute "antitrust injury." *Barton & Pittinos, Inc.,* 118 F.3d at 184.

Defendant relies on two Third Circuit cases to argue that, when a market itself is by law not competitive, a plaintiff cannot claim antitrust injury by asserting that the defendant's practices (here, the refusal to permit the grade crossing) restrained competition. *See City of Pittsburgh v. West Penn Power Comp.,* 147 F.3d 256, 265–68 (3d Cir.1998); *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405 (3d Cir.1997). In *West Penn,* plaintiff claimed that a proposed merger of two power companies restrained competition in the market, but the court pointed out that, at that time, the market was regulated and not competitive, dismissing plaintiff's claim. 147 F.3d at 266–68. Similarly, in *Schuylkill,* the court disagreed with a cogenerator's contention that a power company's refusal to purchase its power during periods of low demand was anticompetitive, again because the power market was, by regulatory design, not competitive. 113 F.3d at 415.

Here, it is evident that BarTech is not a present or potential competitor of the CB & L, but rather a customer. As the *Schuylkill* court stated, "[a] supplier of a product does not become a competitor of the purchaser merely because the purchaser in turn sells the product to the ultimate user." *Id.* Conversely, a purchaser of rail service does not become a competitor of the seller merely because the seller is the conduit between the purchaser and the interstate rail network. Indeed, if Bar-

1985); *Kelly v. General Motors Corp.,* 425

Tech were a competitor of the CB & L, I could not have reached the conclusion I did, *supra,* with respect to the jurisdiction of the STB. Accordingly, in the absence of any other competition, CB & L's present rail market must be deemed as lawfully non-competitive.

Nor can it be said that the C & BL's refusal to allow a grade crossing will expand its monopoly, because it currently has and will continue to have 100% of the common carrier freight market between the main line and its customers. This makes BarTech's antitrust damages problematic; as the Eleventh Circuit has aptly commented, "[i]t requires a long stretch to call an individual refusal to deal 'monopolizing' when it does nothing to increase the refuser's monopoly power and nothing to increase his position in any market." *Mr. Furniture Whse., Inc. v. Barclays Am./Comm'l Inc.,* 919 F.2d 1517, 1523 (11th Cir.1990) (quoting P. Areeda, *Antitrust Law* ¶ 736, at 274 (1978) (internal quotation marks omitted)); *accord* Kenneth L. Glazer & Abbot B. Lipsky, Jr., *Unilateral Refusals to Deal Under Section 2 of the Sherman Act,* 63 Antitrust L.J. 749, 783–84 (1995) (noting that most courts "have been quick to dismiss" such claims).

In *Interface Group, Inc. v. Massachusetts Port Auth.,* 816 F.2d 9 (1st Cir.1987), a charter airline sought access to services at Logan Airport's Terminal C. When Massport refused and required the airline to use another, less favorable terminal, plaintiff sued, claiming attempted monopolization under § 2 of the Sherman Act. The First Circuit, speaking through then-Circuit Judge Breyer, affirmed the dismissal of this claim, opining:

[I]t is difficult to see how denying a facility to one who, like Interface, is not an actual or potential competitor could enhance or reinforce the monopolist's market power.... Thus, we do not see how the facts alleged could make out the actual or potential injury to the competi-

F.Supp. 13, 18 n. 5 (E.D.Pa.1976).

tive process necessary to show a violation of Sherman Act § 2.

*Id.* at 12 (citing P. Areeda & H. Hovenkamp, *Antitrust Law* ¶¶ 736.2d, 736.2e (Supp.1986)).

I agree with the reasoning of these cases. Because the C & BL's refusal to permit the grade crossing did not expand its market power beyond that which it already had, any injury to BarTech from that refusal was simply not "of the type the antitrust laws were intended to prevent." Accordingly, BarTech has not suffered antitrust injury as a matter of law.[7]

### D.

 Finally, defendant argues that, to the extent plaintiff premises its antitrust claim on the "essential facilities doctrine," the claim must also be dismissed. I agree. To state an essential facilities claim under § 2 of the Sherman Act, a plaintiff must show:

> (1) control of the essential facility by a monopolist; (2) the *competitor's* inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility *to a competitor*; and (4) the feasibility of providing the facility.

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996) (emphasis added). Here, plaintiff asserts that the grade crossing is the essential facility, that it is controlled by the CB & L, a monopolist, that BarTech cannot duplicate the crossing, as, for example by choosing an alternate route, and that the crossing can be feasibly provided. Yet, plaintiff ignores the fact that the essential facilities doctrine, as a matter of law, inures only to the benefit of potential or actual competitors of an antitrust defendant. *See Garshman v. Universal Resources Holding Inc.,* 824 F.2d 223, 230 (3d Cir.1987); *accord Thomas v. Network Solutions, Inc.,* 176 F.3d 500, 509 (D.C.Cir.1999), *pet. for cert. filed,* 68 U.S.L.W. 3263 (Oct. 6, 1999); *see*

*generally Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 376–77 (7th Cir.1986) (Posner, J.). As stated *supra,* BarTech is merely a customer of the CB & L, not its competitor. As such, its essential facilities claim fails. *Id.*

### E.

Accordingly, for the foregoing reasons, I will dismiss plaintiff's antitrust claims with prejudice.

### V.

Given my disposition of the antitrust claims and my denial of defendant's motion on the jurisdictional issue, plaintiff's pendent state law claims remain for adjudication. The parties have not briefed the question of supplemental jurisdiction under 28 U.S.C. § 1367, and hence I will direct them to file briefs within twenty days on whether I should retain supplemental jurisdiction.

An appropriate order follows.

### ORDER

AND NOW, this ninth day of November 1999, upon consideration of defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6), dkt. no. 5, plaintiff's unopposed motion for hearing, dkt. no. 14, and the parties' arguments relative thereto, it is hereby ORDERED AND DIRECTED that:

1. the aforesaid motion to dismiss, dkt. no. 5, is GRANTED;

2. plaintiff's antitrust claims are DISMISSED WITH PREJUDICE;

3. the parties shall submit briefs on or before November 29, 1999 on the question of whether this court should, in its discretion, retain supplemental jurisdiction over the remaining pendent state law claims under 28 U.S.C. § 1367.

---

7. I "recognize that the existence of antitrust injury is not typically resolved through motions to dismiss." *Schuylkill,* 113 F.3d at 417. But, as in that case, the issue truly is a pure question of law, and the construction of a factual record could not change the result. Hence, the court sees little reason to put the parties to the time and expense of discovery on this issue.

4. the aforesaid motion for hearing is DENIED.